Argued and submitted May 13, decision of Court of Appeals affirmed; order of Water Resources Commission reversed, and case remanded to commission for further proceedings consistent with this opinion July 10, 2008

## FORT VANNOY IRRIGATION DISTRICT
and Herman Baertschiger, Jr.,
*Respondents on Review,*

*v.*

## WATER RESOURCES COMMISSION
and Ken-Wal Farms, Inc.,
aka Fort Vannoy Farms, Inc.,
*Petitioners on Review.*

(Agency No. T8366;
CA A130508;
SC S055356, S055361)

188 P3d 277

58

_____

Ross Day, Oregonians in Action Legal Center, Tigard, argued the cause and filed the briefs for petitioner on review Ken-Wal Farms, Inc.

Denise G. Fjordbeck, Assistant Attorney General, Salem, argued the cause for petitioner on review Water Resources Commission. With her on the briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Emil R. Berg, Greener Burke Shoemaker PA, Boise, Idaho, argued the cause for respondents on review Fort Vannoy Irrigation District and Herman Baertschiger, Jr. With him on the brief was Ronald S. Yockim, Roseburg.

Joseph H. Hobson, Jr., Ritter Hobson LLC, Salem, filed a brief on behalf of *amicus curiae* Oregon Farm Bureau Federation.

Michael W. Peterkin, Peterkin & Associates, Bend, filed a brief on behalf of *amicus curiae* Water for Life, Inc.

Douglas W. MacDougal, Schwabe Williamson & Wyatt PC, Portland, and Steven L. Shropshire, Jordan Schrader

_____

\* Appeal from Final Order of the Oregon Water Resources Commission. 214 Or App 88, 162 P3d 1066 (2007).

Ramis PC, Portland, filed a brief on behalf of *amicus curiae* Oregon Water Resources Congress.

David E. Filippi and Heath A. Curtiss, Stoel Rives LLP, Portland, filed a brief on behalf of *amici curiae* Arnold Irrigation District, Central Oregon Irrigation District, Swalley Irrigation District, and Tumalo Irrigation District.

DE MUNIZ, C. J.

## DE MUNIZ, C. J.

This case arises from a dispute over an application filed by petitioner Ken-Wal Farms, Inc. (Ken-Wal) to change the points of diversion associated with water rights set forth in two water right certificates (8942 and 8943) that were issued in 1930 to the Fort Vannoy Irrigation District (district), of which Ken-Wal is a member. The issue on review is whether Ken-Wal is the "holder of any water use subject to transfer," as that phrase is used in ORS 540.510(1), such that Ken-Wal has authority under that statute to change the points of diversion associated with the water rights established in those certificates. ORS 540.510(1) provides, in part:

"Except as provided in subsections (2) to (8) of this section, all water used in this state for any purpose shall remain appurtenant to the premises upon which it is used and no change in use or place of use of any water for any purpose may be made without compliance with the provisions of ORS 540.520 and 540.530. However, *the holder of any water use subject to transfer may*, upon compliance with the provisions of ORS 540.520 and 540.530, *change the use and place of use, the point of diversion or the use theretofore made of the water in all cases without losing priority of the right theretofore established.* A district may change the place of use in the manner provided in ORS 540.572 to 540.580 in lieu of the method provided in ORS 540.520 and 540.530."

(Emphases added.)

For the reasons expressed below, we conclude that the district is the "holder of [a] water use subject to transfer" with respect to certificates 8942 and 8943, and that Ken-Wal is not authorized under ORS 540.510(1) to change the points of diversion associated with the water rights established in those certificates without the district's consent. We therefore affirm the decision of the Court of Appeals.

Our analysis of the issue presented is divided into three sections. First, we describe the factual and procedural background of the proceeding. Second, we place the issue in its historical context, tracing the origins and development of the Water Rights Act and the Irrigation District Law in

Oregon.[1] And finally, after identifying the parties' arguments on review, we determine the legislature's intent regarding the meaning of the phrase "holder of any water use subject to transfer" by employing a three-part analysis framed by the statutory text and context. We turn first to the facts and procedural posture of the case.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Ken-Wal is a landowner within, and a member of, the district. It obtains water to raise its crops under five water right certificates, including certificates 8942 and 8943, which the State Engineer issued to the district in 1930.[2] The issue on review concerns those two certificates.[3] Diverting water from points along the Rogue River and its tributaries, the district delivers the water provided under those two certificates to Ken-Wal's land—as well as to the lands of other members—through the district's irrigation system. That is, Ken-Wal owns a portion of the land to which the district supplies the water provided under certificates 8942 and 8943 (*i.e.*, the appurtenant land).[4]

In November 1999, Ken-Wal applied to the Water Resources Department (department) to change the points of diversion associated with the water rights set forth in all five of the water right certificates. In doing so, Ken-Wal sought to

---

[1] As provided in ORS 537.010, the "Water Rights Act" includes "ORS 536.050, 537.120, 537.130, 537.140 to 537.252, 537.390 to 537.400, 538.420, 540.010 to 540.120, 540.210 to 540.230, 540.310 to 540.430, 540.505 to 540.585 and 540.710 to 540.750." The "Irrigation District Law" is set forth in ORS chapter 545. ORS 545.001.

[2] Before the creation of the Water Resources Department, the State Engineer was charged with administering water right transfers. *See, e.g.*, Or Laws 1927, ch 219, § 1 (identifying State Engineer as official previously charged with administration of water rights transfer provision). Although the State Engineer issued both certificates in 1930, the priority date associated with certificate 8942 is June 21, 1930, and the priority date associated with certificate 8943 is April 6, 1922.

[3] Three of the water right certificates (2803, 3247, and 15340) were issued to Ken-Wal's predecessors, rather than to the district, and are not at issue here.

[4] Certificate 8942 designates the appurtenant land (*i.e.*, the place of use for the water provided under that certificate) as consisting of 817 acres, and certificate 8943 consisting of 71 acres. At oral argument before this court, the parties agreed that Ken-Wal's land constitutes only a portion of the land to which the district supplies the water provided under the certificates—*i.e.*, that Ken-Wal owns only a portion of the appurtenant land designated in the certificates.

(1) consolidate the points of diversion to two locations within the boundaries of its farm; and (2) deliver the water provided under all five certificates through a new irrigation system that it would construct and maintain.[5] The district would not exercise control over Ken-Wal's new irrigation system, notwithstanding the fact that Ken-Wal would obtain a portion of the water flowing through that system under the two certificates issued to the district. The district and one of its members, Baertschiger,[6] protested the proposed changes, asserting, in part, that the district was the "certificated owner of record" of certificates 8942 and 8943 and that its consent therefore was required to change the points of diversion associated with the water rights established in those certificates.[7] The district refused to give its consent.

The department rejected the district's challenge, issuing a proposed order that approved Ken-Wal's application and that concluded that the district's consent was not required to change the disputed points of diversion. The proposed order incorporated a Ruling on Legal Issues and Order that had been issued earlier in the administrative proceedings and that contained the following conclusion relevant to the issue on review:

> "As water rights are, in the West, essentially defeasible usufructuary rights attached to specifically identified land rather than personal rights which may be exercised at any location and only by the individual whose name is on the certificate evidencing that right, it is logical to conclude that the 'holder' of the right referred to in [ORS 540.510(1)] is the owner of the land to which the right is appurtenant."

---

[5] Ken-Wal's application describes the new irrigation system as follows:

"The system will be a pressurized sprinkler system with 4 big gun traveling sprinklers and a 125 HP electric pump. The mainline will be a buried plastic pipe starting at 12 inch diameter and ending with 5 inch diameter pipe with 4 inch risers to connect the 4 traveling big gun sprinklers. The system has been engineered by Natural Resource Conservation Service."

[6] We refer to the district and Baertschiger collectively as the "district."

[7] The district also challenged Ken-Wal's proposed changes concerning certificates 2803, 3247, and 15340, on the ground that Ken-Wal had not used the water provided thereunder in accordance with the terms of the certificates during the preceding five years. That additional ground is not at issue on review in this court.

The district filed exceptions to the proposed order. *See* OAR 137-003-0650(1) (authorizing filing of such exceptions).

The Water Resources Commission (commission) considered the district's exceptions but ultimately issued a final order that conformed to the proposed order. Acknowledging that "the issue of ownership of a water right within an irrigation district is a recurring question," the commission determined that the ownership of the water rights established in certificates 8942 and 8943 did not control whether Ken-Wal was required to obtain the district's consent to change the associated points of diversion. Rather, focusing its analysis on whether the transfer provisions in ORS chapter 540 require the district's consent, the commission apparently considered Ken-Wal the "holder of [a] water use subject to transfer" under ORS 540.510(1) on the ground that the water rights established in the certificates are appurtenant to land owned by Ken-Wal.[8] In accordance with the commission's final order, the department later issued a final order approving Ken-Wal's proposed changes to the points of diversion.[9]

The district subsequently sought judicial review of the commission's order, and the Court of Appeals reversed. That court identified the relevant inquiry as whether Ken-Wal or the district was the "holder of [a] water use subject to transfer," within the meaning of ORS 540.510(1), with respect to the water rights established in certificates 8942 and 8943. The court examined the statutory text and context, ultimately concluding that the phrase "holder of any water use subject to transfer" refers to the party to which a water right certificate is issued. *Fort Vannoy Irrigation v. Water Resources Comm.*, 214 Or App 88, 95-99, 162 P3d 1066 (2007). That is, the court construed "holder" as referring to the party that owns the "right to use of the water" provided

---

[8] The commission found that Ken-Wal "owns all the land appurtenant to the water rights proposed for transfer." That finding reflects the fact that Ken-Wal owns all the land to which water is provided *to it* under certificates 8942 and 8943—*i.e.*, that Ken-Wal's share of the certificated water is supplied solely on land that it owns—not that Ken-Wal owns all the land to which water is provided under the certificates.

[9] The department's final order also cancelled a portion of the water right established in certificate 8942 and diminished a portion of that water right from primary to supplemental irrigation. On review, the district has not advanced any separate argument regarding those specific changes.

under a water right certificate, which the court determined to be the party to which the certificate is issued. *See id.* at 96 ("[A]n entity in whose name a water right certificate is issued is the owner of the right to use of the water."). For certificates 8942 and 8943, that party is the district.

We allowed the petitions for review filed by Ken-Wal and the commission to interpret the phrase "holder of any water use subject to transfer" in ORS 540.510(1). To do so, we initially place the parties' controversy in its historical context by examining the evolution of the Water Rights Act and the Irrigation District Law.

## II. HISTORICAL BACKGROUND

The premium placed on irrigated agriculture in the American West during the preceding 150 years of United States history cannot be overstated,[10] particularly the role that irrigation played in the settlement of the western states. That role is described, among other places, in the observations of Justice Sutherland, writing for the United States Supreme Court in *Power Co. v. Cement Co.*, 295 US 142, 55 S Ct 725, 79 L Ed 1357 (1935):

"These states and territories comprised the western third of the United States—a vast empire in extent, but still sparsely settled. From a line east of the Rocky Mountains almost to the Pacific Ocean, and from the Canadian border to the boundary of Mexico—an area greater than that of the original thirteen states—the lands capable of redemption, in the main, constituted a desert, impossible of agricultural use without artificial irrigation.

"In the beginning, the task of reclaiming this area was left to the unaided efforts of the people who found their way by painful effort to its inhospitable solitudes. These western pioneers, emulating the spirit of so many others who had gone before them in similar ventures, faced the difficult problem of wresting a living and creating homes from the

---

[10] Historically, the Water Rights Act and the Irrigation District Law are relatively recent measures in a cross-cultural pattern of organized irrigation that spans the preceding 1,300 years in the American West. *See* Joseph L. Sax, *et al.*, *Legal Control of Water Resources* 281-86 (3d ed 2000) (discussing history of western water law).

raw elements about them, and threw down the gage of battle to the forces of nature. With imperfect tools, they built dams, excavated canals, constructed ditches, plowed and cultivated the soil, and transformed dry and desolate lands into green fields and leafy orchards. In the success of that effort, the general government itself was greatly concerned—not only because, as owner, it was charged through Congress with the duty of disposing of the lands, but because the settlement and development of the country in which the lands lay was highly desirable."

*Id.* at 156-57. As part of that historical phenomenon, the Water Rights Act and the Irrigation District Law share an intertwined history, in that both laws served to establish irrigated agriculture on the lands of this state. A proper entry point into that common background is the advent of the prior appropriation doctrine in Oregon.

Over the preceding century and a half, Oregon water law has known two doctrines applicable to the use of surface water (*i.e.*, water from streams and lakes)—the riparian doctrine and the prior appropriation doctrine. Janet C. Neuman, *Oregon*, 6 Waters and Water Rights 941 (Robert E. Beck ed. 1991); Chapin D. Clark, *Survey of Oregon's Water Laws* 93-95 (1983); Wells A. Hutchins, *The Common-Law Riparian Doctrine in Oregon: Legislative and Judicial Modification*, 36 Or L Rev 193, 193 (1957). Those doctrines are distinct in terms of the bases on which water rights are founded. Riparian rights are based on a party's ownership of land adjacent to a water source (*i.e.*, riparian land); in contrast, appropriative rights derive from a party's beneficial use of the water appropriated from the source, irrespective of the ownership of the riparian land. *See* Sax, *Legal Control of Water Resources* at 20-21, 98-99 (describing riparian and appropriative rights).

Although the riparian and appropriation doctrines were once both recognized in this state, the enactment of the Water Rights Act in 1909 (Or Laws 1909, ch 216) marks the ascendancy of the appropriation doctrine as the prevailing water law of Oregon. The event to which the arrival of that doctrine is attributable throughout the American West is the California gold rush of the late 1840s and early 1850s. *See* Sax, *Legal Control of Water Resources* at 281-86 (discussing

evolution of appropriation doctrine). The development of the appropriation doctrine in that context—including the historical reasons for the central tenets of temporal priority and beneficial use—has been described as follows:

> "The discovery of gold in the tailrace of Sutter's mill triggered an avalanche of gold seekers. Arriving by land and by sea, they established mining camps in an area that only recently had been acquired from Mexico by the Treaty of Guadalupe Hidalgo. As yet there were no land offices and little local government; the miners were trespassers on the public domain. Nonetheless, they had need of government, of some form of association, to protect their mining claims. So in camp after camp they met and organized mining districts, adopting rules for the definition of their property rights in the gulches. * * * To retain their claims, miners had to work them with diligence; otherwise they were forfeited. When questions of right arose, they were settled by reference to priority. Since the miners were squatters on the public domain, they applied the law of the public domain, first in time, first in right.

> "After the days of the pan and shovel gave way to ditches and sluiceboxes, questions of right to use the streams arose. When they did, the miners applied the same rules to water as they had to the land—first in time, first in right. He who diverted water first had the prior right to it to the extent of his diversion for use on both riparian and non-riparian lands. To perfect the right, ditches had to be dug with diligence and the water applied to beneficial use. It was not to be wasted. As with the claims, when the use ceased, the right ceased. Here was the genesis of a new property right."

Robert Dunbar, *Forging New Rights in Western Waters* 61 (1983). This court previously has described the origin of the appropriation doctrine in similar terms. *See Brown v. Baker*, 39 Or 66, 72-73, 65 P 799 (1901) (identifying origin of appropriation doctrine as local mining customs throughout the "Pacific Coast" during and subsequent to California gold rush). Relatedly, as early as 1864, the Oregon Legislative Assembly recognized the right of miners to obtain vested water rights in accordance with local custom. General Laws of Oregon, Mines, ch XXXIV, § 6, p 814 (Deady 1845-1864) ("Miners shall be empowered to make local laws in relation to

the possession of water rights * * *, subject to the laws of the United States.").

Notwithstanding its roots in the mining context, the appropriation doctrine was extended to water usage in other economic sectors, including irrigated agriculture, both in Oregon and elsewhere in the West during the late-nineteenth and early-twentieth centuries. *See, e.g.*, *Power Co.*, 295 US at 154 (stating that rule generally recognized throughout western states and territories was that acquisition of water by prior appropriation for beneficial use was entitled to protection, and that rule applied whether water was diverted for manufacturing, irrigation, or mining purposes); *Parkersville District v. Wattier*, 48 Or 332, 340, 86 P 775 (1906) (explaining that discovery of gold in California gave rise to custom, established by miners, of using water of streams flowing through public lands to separate precious metal from baser material, and that use of water from such streams was extended to agriculture, manufacturing, and other purposes). Among other sources, the legislative acts that preceded the Water Rights Act—the 1891 Act (Or Laws 1891, p 52); the 1899 Act (Or Laws 1899, p 172); and the 1905 Act (Or Laws 1905, ch 228)—expressly recognized and extended the appropriation doctrine in the foregoing manner. *See, e.g.*, Or Laws 1891, p 53 (authorizing appropriation for irrigation purposes).

Although the appropriation doctrine enabled irrigators to divert and use water to raise crops on nonriparian lands, the scope of resources required to accomplish such appropriations sometimes proved prohibitive. As one scholar has written:

> "From the earliest times, the application of water for irrigation has required contributions of labor resources, and capital beyond the means of individuals. Some sort of organizational structure has been necessary. Agricultural irrigation on a large scale has existed from ancient times and has been pursued regularly in the United States since the opening of the West."

John H. Davidson, *Distribution and Storage Organizations*, 3 Waters and Water Rights 25-1 (Robert E. Beck ed. 1991). To similar effect, this court has stated:

"The general purpose of an appropriation is to utilize the water in the arid regions, where the supply is limited, for the development and advancement of beneficial industries. In many localities where the water is difficult of diversion, and the expense considerable in conducting it to the place of use, if individual landholders, or even an aggregation of them, were required to make the appropriation for use upon their own possession, these general purposes would be entirely defeated simply for the reason that such holders could not bear the burden of making the appropriation."

*Nevada Ditch Co. v. Bennett*, 30 Or 59, 96, 45 P 472 (1896).

In response to the resource burden, the irrigation district is one of several water development and distribution organizations that emerged to facilitate irrigated agriculture throughout the West during the late-nineteenth century. *See* Sax, *Legal Control of Water Resources* at 597-601 (discussing carrier ditch companies, mutual water companies, and irrigation districts); *see also* Or Laws 1891, p 53 (authorizing appropriation by "[a] corporation organized for the construction and maintenance of a ditch or canal or flume for general irrigation purposes"). In that regard, California enacted the seminal irrigation district legislation, the Wright Act, in 1887. 1887 Cal Stat, ch 34. Over the next 30 years, the other western states followed suit, so that, "[b]y 1917, all seventeen conterminous western states had adopted variations on the Wright Act." Sax, *Legal Control of Water Resources* at 600.

In 1895, the Irrigation District Law was enacted in Oregon as a copy of the Wright Act. Or Laws 1895, p 13; *Twohy Bros. Co. v. Ochoco Irr. Dist. et al.*, 108 Or 1, 13-14, 210 P 873 (1922). This court has described the purpose of the Irrigation District Law with respect to irrigated agriculture as follows:

"The purpose of the law is to make bodies of arid land, susceptible of irrigation from a common source and through the same system of works, productive by distributing water over them through canals, etc., belonging to and the property of the irrigation district.

> "The basal principle is the division of the arid area of the State, upon invitation of the settlers thereon, into communities or districts, which are determined by their irrigability from a common source and through the same system of works, and to invest such communities with power to raise revenue by taxation and the issuing of bonds for the purpose of acquiring water rights and constructing the necessary canals, reservoirs, and works for the distribution of the water over the lands within the district."

*Little W. W. Irr. Dist. v. Preston*, 46 Or 5, 7, 78 P 982 (1904); *see also Fallbrook Irrigation District v. Bradley*, 164 US 112, 153, 17 S Ct 56, 41 L Ed 369 (1896) (upholding constitutionality of Wright Act; "The future prosperity of [several western] States, it was claimed, depended upon the validity of this act as furnishing the only means practicable for obtaining artificial irrigation, without the aid of which millions and millions of acres would be condemned to lie idle and worthless, which otherwise would furnish enormous quantities of agricultural products and increase the material wealth and prosperity of that whole section of the country.").

The current version of the Irrigation District Law retains the original purpose and structure, enabling owners of irrigable land to petition for the formation of an irrigation district. *See* ORS 545.025(1) ("When owners of land that is irrigated or susceptible to irrigation desire to provide for the construction of works for irrigation of their land [or] to provide for the reconstruction, betterment, extension, purchase, operation or maintenance of works already constructed, * * * they may propose the organization of an irrigation district under the Irrigation District Law * * *."). Once formed, the district is governed by an elected board of directors. ORS 545.041; ORS 545.135. Among other duties, the board must "[e]stablish equitable bylaws, rules and regulations * * * for the distribution and use of water among the landowners." ORS 545.221(1)(c). To fulfill its duties, the board has "the right to acquire by lease, purchase, condemnation, or other legal means, all lands, water, water rights, rights of way, easements and other property * * * necessary for the construction, use, supply, maintenance, repair and improvement of any canals or works proposed to be constructed by the board." ORS 545.239(1). Relatedly, "[t]he board also has the

right to so acquire lands * * * for reservoirs, and the right to store water in constructed reservoirs, for the storage of needful waters, or for any other purpose reasonably necessary for the purposes of the district." The legal title to all such property "vest[s] in the irrigation district and [is] held by it in trust for and * * * is dedicated and set apart to the uses and purposes set forth in the Irrigation District Law[,]" and "[t]he board is authorized and empowered to hold, use, acquire, manage, occupy, possess and dispose of the property as provided in the Irrigation District Law." ORS 545.243.

When considered against the historical backdrop described in this section, the preceding provisions of the Irrigation District Law are fundamental to our analysis of the issue presented. Viewed broadly, that issue is a recurring one in the western states, namely, whether the ownership of water rights resides with a water organization or its members. This court previously has addressed the issue in two cases involving entities other than irrigation districts. *See In re Waters of Walla Walla River*, 141 Or 492, 498, 16 P2d 939 (1932) (concluding private irrigation company owned water rights); *Eldredge v. Mill Ditch Co.*, 90 Or 590, 596-97, 177 P 939 (1919) (concluding stockholders of mutual water company owned water rights). Likewise, the highest courts of other western states have encountered the issue in diverse contexts and arrived at differing conclusions.[11]

---

[11] *Compare East Jordan Irr. Co. v. Morgan*, 860 P2d 310, 313, 316 (Utah 1993) (concluding mutual water corporation owned water rights such that shareholder not authorized to change point of diversion absent corporation's consent); *Madera Irr. Dist. v. All Persons, Etc.*, 47 Cal 2d 681, 692-93, 306 P2d 886 (1957) (concluding former landowners in irrigation district organized under Wright Act did not have right to use water provided by district on lands excluded from district); *Consolidated People's Ditch Co. v. Foothill Ditch Co.*, 205 Cal 54, 64, 269 P 915 (1928) (concluding shareholder (irrigation district) in various mutual water corporations did not have right to change points of diversion associated with water provided by corporations); and *Jenison v. Redfield*, 149 Cal 500, 503-04, 87 P 62 (1906) (concluding landowner in irrigation district organized under Wright Act did not have right to use water provided by district on land outside district); *with Wadsworth Ditch Co. v. Brown*, 39 Colo 57, 61-62, 88 P 1060 (1907) (concluding shareholder of mutual ditch company authorized to change point of diversion; "[t]he right to change [the point of diversion] is a property right. [It] belongs to the stockholder (consumer) in a mutual ditch company as fully as to any other appropriator"); *and Slosser v. Salt River Val. Canal Co.*, 7 Ariz 376, 395-96, 65 P 332 (1901) (concluding ownership of land essential to appropriative rights such that nonlandowning private irrigation corporation did not own such rights).

Ultimately, our resolution of the issue in this case—*i.e.*, our interpretation of the phrase "holder of any water use subject to transfer" in ORS 540.510(1)—is controlled by the intent of our legislature as expressed in the Water Rights Act and the Irrigation District Law.[12] We turn to that inquiry.

## III. DISCUSSION

■ ■ We approach our interpretive task under our now familiar methodology, examining the statutory text in its context. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610, 859 P2d 1143 (1993). Terms of common usage within the text are given their plain, natural, and ordinary meaning, *id.* at 611, and our analysis of context encompasses "provisions of the same statute and related statutes * * * as well as the preexisting common law and the statutory framework within which the law was enacted." *Denton and Denton*, 326 Or 236, 241, 951 P2d 693 (1998).

As noted, ORS 540.510(1) provides, in part:

> "Except as provided in subsections (2) to (8) of this section, all water used in this state for any purpose shall remain appurtenant to the premises upon which it is used and no change in use or place of use of any water for any purpose may be made without compliance with the provisions of ORS 540.520 and 540.530. However, *the holder of any water use subject to transfer may*, upon compliance with the provisions of ORS 540.520 and 540.530, *change the use and place of use, the point of diversion or the use theretofore made of the water in all cases without losing priority of the right theretofore established.* A district may change the place of use in the manner provided in ORS 540.572 to 540.580 in lieu of the method provided in ORS 540.520 and 540.530."

(Emphases added.) The parties' arguments on review concern whether Ken-Wal or the district is the "holder of [a]

---

[12] We are mindful that some irrigation districts restrict their members' authority to change a point of diversion through regulations or contractual provisions—*e.g.*, districts formed pursuant to the federal Carey Act, 43 USC § 641 (1894). Our holding in this case regarding Ken-Wal's authority to change the disputed points of diversion—which, as noted, rests on our interpretation of the phrase "holder of any water use subject to transfer" in ORS 540.510(1)—does not concern such restrictions.

water use subject to transfer" within the meaning of that provision. We initially discuss those arguments before engaging in our own independent analysis of the statute. *See Stull v. Hoke*, 326 Or 72, 77, 948 P2d 722 (1997) ("In construing a statute, this court is responsible for identifying the correct interpretation, whether or not asserted by the parties.").

A. *The Parties' Arguments*

The parties' arguments generally proceed from the premise that the "holder of [a] water use subject to transfer" in this case is the party with an ownership interest in the water rights established in certificates 8942 and 8943.[13]

Ken-Wal and the commission contend that the "holder of [a] water use subject to transfer" is the party that puts the water provided under certificates 8942 and 8943 to beneficial use on the land to which the water rights are appurtenant. That is, they assert that, despite the fact that the certificates were issued to the district, Ken-Wal holds the ownership interest in the water rights established in those certificates—and thus is the "holder" for purposes of ORS 540.510(1)—because (1) Ken-Wal alone beneficially uses the water provided under the certificates; and (2) Ken-Wal owns the land on which that certificated water is used (*i.e.*, a portion of the appurtenant land). According to Ken-Wal and the commission, the district cannot be considered the "holder of [a] water use subject to transfer," because it neither beneficially uses the water provided under the certificates nor owns any of the appurtenant land.[14]

---

[13] It is possible that the arguments of Ken-Wal and the commission may be construed as asserting that the "holder of [a] water use subject to transfer" is the party with an ownership interest in the *use* of the water provided under certificates 8942 and 8943, rather than the party with an ownership interest in the water rights established in those certificates. We address that position below.

[14] In addition to its arguments concerning the ownership of the water rights established in certificates 8942 and 8943, Ken-Wal contends that a district cannot be a "holder of [a] water use subject to transfer" within the meaning of ORS 540.510(1), because that provision assertedly treats "the holder" and "a district" as distinct terms. That is, Ken-Wal draws attention to the fact that the second sentence of ORS 540.510(1) addresses the authority of "the holder" to make various changes, and the third sentence separately provides: "A district may change the place of use in the manner provided in ORS 540.572 to 540.580 in lieu of the method provided in ORS 540.520 and 540.530." We reject Ken-Wal's assertion that the two terms are mutually exclusive. Rather, ORS 540.510(1) contemplates that a "district" is a type of "holder" authorized to change the place of use "in the manner

In contrast, the district founds its claim to the ownership interests in the water rights established in certificates 8942 and 8943 on (1) the fact that the certificates were issued to it; and (2) the implications of the trust relationship that exists between it and its members like Ken-Wal. The district rejects the proposition that Ken-Wal can be considered the "holder of [a] water use subject to transfer" on the grounds of beneficial use or the ownership of a portion of the appurtenant land.

B. *Analysis*

We engage in a three-part analysis to determine whether Ken-Wal or the district is the "holder of [a] water use subject to transfer" with respect to certificates 8942 and 8943. Our analysis is successive. Each part addresses a specific aspect of that phrase that, once examined, sheds light on the meaning of the phrase as a whole. We first briefly analyze the interest that the "holder" has in the "water use subject to transfer." Next, we consider the statutory definition of "water use subject to transfer" in ORS 540.505(4). And, finally, we determine which party is the "holder of [a] water use subject to transfer" by measuring the parties' arguments against the statutory text and context.

1. *The Interest of the "Holder"*

■ As described above, the Court of Appeals concluded that the phrase "holder of any water use subject to transfer," as used in ORS 540.510(1), refers to a party that has a possessory or ownership interest in the right to use of the water provided under a water right certificate. On review, the parties do not appear to dispute that the holder's interest in the "water use subject to transfer" is possessory in nature. The dictionary bears out that interpretation, defining "holder," in

provided in ORS 540.572 to 540.580 [or by] the method provided in ORS 540.520 and 540.530."

Relatedly, we also reject without further discussion any suggestion made by Ken-Wal that a district cannot be considered the "holder of [a] water use subject to transfer" under ORS 540.510(1) based on contextual provisions in ORS chapter 540 governing district participation in, and consent to, proposed water right transfers. *See, e.g.*, ORS 540.570 (district-initiated temporary transfers of place of use); ORS 540.572 (district-initiated permanent transfers of place of use due to lack of beneficial use or nonirrigability of appurtenant land); ORS 540.580 (district-initiated permanent transfers of place of use).

part, as "one that holds something: as a (1): POSSESSOR, OWNER * * *." *Webster's Third New Int'l Dictionary* 1079 (unabridged ed 2002). Similarly, *Webster's* defines "hold," in part, as "to retain in one's keeping: maintain possession of * * * POSSESS, HAVE * * *." *Id.* at 1078. In short, both definitions favor an interpretation of the phrase "holder of any water use subject to transfer" under which the "holder" has an ownership interest in the "water use subject to transfer."

The more challenging question is which party is the "holder of [a] water use subject to transfer" relevant to certificates 8942 and 8943. As to that question, we first examine the statutory definition of the phrase "water use subject to transfer."

2. *The "Water Use Subject to Transfer"*

ORS 540.505(4) provides the following four-part definition:

" 'Water use subject to transfer' means *a water use established by*:

"(a) An adjudication under ORS chapter 539 as evidenced by a court decree;

"(b) *A water right certificate*;

"(c) A water use permit for which a request for issuance of a water right certificate under ORS 537.250 has been received and approved by the Water Resources Commission under ORS 537.250; or

"(d) A transfer application for which an order approving the change has been issued under ORS 540.530 and for which proper proof of completion of the change has been filed with the Water Resources Commission."

(Emphases added.) There is no dispute among the parties that this case solely concerns paragraph (b): "a water use established by * * * [a] water right certificate." That is, the "water use subject to transfer" at issue consists of the water use established by each of the certificates issued to the district. ORS 540.510(1) exclusively authorizes the "holder" of the water use established by each certificate to change the associated point of diversion.

As we understand their arguments, a potential disagreement between the parties concerns the term "use" in the phrase "a water use established by * * * [a] water right certificate." A "water use established by * * * [a] water right certificate" arguably could refer to either (1) the *right to use* water established by a water right certificate (*i.e.*, the certificated water right); or (2) the *use* of water provided under a water right certificate. The first interpretation contemplates that the "holder" has an ownership interest in the certificated water right. Under the second interpretation, the "holder" has only an ownership interest in the use of the certificated water, regardless of the ownership of the water right itself. In part, Ken-Wal and the commission appear to advocate the latter interpretation, contending that Ken-Wal is the "holder" on the ground that it has an ownership interest in the use of the water provided under certificates 8942 and 8943.[15]

We begin our analysis of the legislature's intended meaning by examining the historical development of the current statutory phrase "holder of any water use subject to transfer" in ORS 540.510(1). *See Krieger v. Just*, 319 Or 328, 336, 876 P2d 754 (1994) ("[W]ording changes adopted from session to session are a part of context of the present version of the statute being construed.").

The first version of the transfer provision now codified at ORS 540.510(1) was enacted in 1909 as part of the original Water Rights Act, providing, in part:

"[I]f for any reason it should at any time become impracticable to beneficially or economically use water for the irrigation of any land to which the water is appurtenant, said *right* may be severed from said land, and simultaneously transferred, and become appurtenant to other land, without losing priority of right theretofore established, * * * on the approval of an application of the *owner* to the Board of Control."

---

[15] For example, in its brief on the merits filed in this court, Ken-Wal argues, in part, that the district cannot be considered a "holder of [a] water use subject to transfer" because the district assertedly does not have "a possessory or ownership interest in the *use* of the water" provided under certificates 8942 and 8943.

Or Laws 1909, ch 216, § 65 (emphases added). The first version of the transfer provision thus used the term "owner" in association with the term "right," authorizing the owner of a water right to pursue a transfer by filing an application with the Board of Control.

The transfer provision began to resemble its current form in the 1927 version, which provided, in part:

> "[T]he *owner of any water right* may, upon compliance with the provisions of this act, change the use and place of use, the point of diversion or the use theretofore made of the water in all cases without losing priority of the right theretofore established."

Or Laws 1927, ch 219, § 1 (emphasis added). Notwithstanding the fact that its phrasing differed from the first version, the 1927 version retained the term "owner" in association with the term "right" (*i.e.*, "water right"), authorizing the "owner of any water right" to pursue the changes currently provided for in ORS 540.510(1).

With only a minor modification, the third version of the transfer provision was enacted in 1991 and codified in ORS 540.510(1), providing, in part:

> "[T]he *owner of any certificated water right* may, upon compliance with the provisions of ORS 540.520 and 540.530, change the use and place of use, the point of diversion or the use theretofore made of the water in all cases without losing priority of the right theretofore established."

Or Laws 1991, ch 957, § 7(1) (emphasis added). While retaining the terms "owner" and "right" in the phrase "owner of any certificated water right," the 1991 version of the transfer provision was distinct in its exclusive focus on "certificated" water rights. That transfer provision authorized only the "owner of [a] certificated water right" to change the associated use, place of use, and point of diversion.

The legislature enacted the current version of the transfer provision in 1995. Or Laws 1995, ch 274, § 2. The same act that amended ORS 540.510(1) to include the phrase "holder of any water use subject to transfer" also amended ORS 540.505 to include the four-part definition of the phrase "water use subject to transfer" that, notwithstanding a minor

amendment in 1997 (Or Laws 1997, ch 42, § 2), exists at present. Or Laws 1995, ch 274, § 1. Thus, the legislature abandoned the exclusive focus on certificated water rights in the 1991 version of ORS 540.510(1) by deleting the phrase "owner of any certificated water right," substituting the phrase "holder of any water use subject to transfer," and enacting a four-part definition of the phrase "water use subject to transfer" that extended beyond certificated water rights.

■ The definitions of the phrase "water use subject to transfer" in ORS 540.505(4)(a) to (d) shed light on the inclusion of terms "holder" and "use" in the phrase "holder of any water use subject to transfer" in ORS 540.510(1). As explained in detail below, the procedures in ORS chapter 537 that govern the acquisition of an appropriative right provide that the issuance of a water right certificate is the act that vests a certificated water right in a party. *See, e.g.*, ORS 537.250(3) (describing significance of issuance of water right certificate). Before the issuance of a certificate, the prospective appropriator holds only an inchoate right that, although it may allow for water use, does not constitute a vested water right. *See, e.g.*, *Green v. Wheeler*, 254 Or 424, 430-31, 458 P2d 938 (1969), *cert den*, 397 US 990 (1970) (explaining appropriative right does not vest prior to issuance of certificate). The appearance of the terms "holder" and "use" in ORS 540.510(1) must be considered in light of the fact that the definitions of the phrase "water use subject to transfer" in ORS 540.505(4)(c) and (d) both involve water "rights" that are inchoate in nature.

ORS 540.505(4)(c) involves a "water use permit for which a request for issuance of a water right certificate * * * has been received and approved by the Water Resources Commission * * *." A party in the precise position identified in paragraph (c) has completed every step in the application process that precedes the issuance of a water right certificate. ORS 537.130; ORS 537.140(1); ORS 537.230(1); ORS 537.230(4). However, until the department issues the certificate, the party's water use permit establishes an inchoate, rather than a vested, water right.

ORS 540.505(4)(d) presents the same situation with regard to a transfer application. That provision contemplates that the commission has issued an order approving the application, ORS 540.530(1)(a), and that the applicant has filed a proper proof of completion, ORS 540.530(2)(a). Nonetheless, the commission has not yet issued the certificate that incorporates the changes effected by the transfer, *see id.*, and thus the application falls short of establishing a vested water right.[16]

Ultimately, the usage of the terms "holder" and "use" in the phrase "holder of any water use subject to transfer" tracks the extension of the transfer provision to the inchoate rights identified in ORS 540.505(4)(c) and (d). The appearances of the terms "owner," "right," "water right," and "certificated water right" in the earlier versions of the transfer provision make sense given that those provisions did not extend to water rights that were inchoate in nature. Conversely, however, the usage of those terms in reference to a party's possession of the "rights" established by the water use permit and transfer application in ORS 540.505(4)(c) and (d) would disregard the inchoate nature of those "rights." The inclusion of the terms "holder" and "use" in the phrase "holder of any water use subject to transfer" accounts for the foregoing consideration, rather than favoring an interpretation of the phrase "a water use established by * * * [a] water right certificate" that contemplates a "user" ("holder") of water provided under a water right certificate having authority to alter the associated water right.

The appearance of the phrase "water use subject to transfer" throughout ORS chapter 540 also sheds light on the meaning of the phrase "a water use established by * * * [a] water right certificate" in ORS 540.505(4). For example, ORS 540.520, which governs applications for changes of use, place of use, and point of diversion, provides, in part:

---

[16] For applicants other than irrigation districts, ORS 540.530(2) provides that the commission "shall cancel [any] previous certificate * * * [and] issue a new certificate" when a proper proof of completion of the authorized changes has been filed. For irrigation district applicants, ORS 540.530(2)(a) authorizes the commission to modify any previous certificate in lieu of issuing a new certificate upon filing of a proper proof of completion.

"(8) An application for a change of use under this section is not required *if the beneficial use authorized by the water use subject to transfer* is irrigation and [additional conditions are met]."

(Emphasis added.) That provision treats "beneficial use" and the "water use [established by a water right certificate]" as distinct from one another; the former is authorized by the latter. Similarly, ORS 540.523(3), which governs temporary transfers in the place of use and associated points of diversion, provides:

"All *uses of water* for which a temporary transfer is allowed under this section shall revert automatically *to the terms and conditions of the water use subject to transfer* upon expiration of the temporary transfer period."

(Emphases added.) Again, the "use[ ] of water" is identified distinctly from the "water use [established by a water right certificate]." The terms and conditions of the latter dictate the use of the water. ORS 540.531, which authorizes the transfer of a surface water point of diversion to allow the appropriation of ground water, provides additional context, stating, in part:

"(2) The Water Resources Department may allow a transfer of the point of diversion under subsection (1) of this section if:

"* * * * *

"(a)(C) The *use of the new point of diversion* will affect the surface water source similarly to *the authorized point of diversion specified in the water use subject to transfer* * * *."[17]

(Emphases added.) The authorized point of diversion is "specified in the water use [established by a water right certificate]," which, again, describes the authorized point of diversion as a term of the certificated water right. Finally, ORS 540.570(1)(b), which authorizes districts to temporarily change the place of use associated with water provided under

---

[17] ORS 540.531(2)(a)(D) and (3)(c) also contain the phrase "specified in the water use subject to transfer." *See also* ORS 540.585(1)(b) ("The type of use specified in the original water use subject to transfer is irrigation[.]").

certificated water rights, states, in part, that such a transfer may occur if:

"The *type of use authorized under the water use subject to transfer* remains the same * * *."[18]

(Emphasis added.) Again, the "water use [established by a water right certificate]" authorizes the "type of use" and thus is distinct from it.

In sum, the manner in which the phrase "water use subject to transfer" is used in the foregoing provisions does not support a construction of the phrase "a water use established by * * * [a] water right certificate" in ORS 540.505(4) that equates the term "a water use" with the use of water provided under a certificate, rather than the certificated water right itself.

■ Finally, the meaning of the phrase "a water use established by * * * [a] water right certificate" in ORS 540.505(4) must be considered in relation to the changes that ORS 540.510(1) authorizes the "holder" to make, namely, changes to "the use and place of use, the point of diversion or the use theretofore made of the water" provided under a "water use subject to transfer." This court's case law recognizes those features as elements of an appropriative right.

"The elements of an appropriation of water * * * are: '(a) Quantity of water appropriated; (b) time, period, or season when the right to the use exists; (c) the place upon the stream at which the right of diversion attaches; (d) the nature of the use or the purpose to which the right of use applies, such as irrigation, domestic use, culinary use, commercial use, or otherwise; (e) the place where the right of use may be applied; [and] (f) the priority date of appropriation or right as related to other rights and priorities.' "

*Tudor v. Jaca et al.*, 178 Or 126, 142-43, 164 P2d 680 (1945) (quoting *Rocky Ford Canal Co. v. Cox*, 59 P2d 935, 939 (Utah

---

[18] *See also* ORS 540.580(1)(a), (b) (permitting district-initiated petition for permanent change in place of use if, among other requirements, "[t]he rate, duty and total number of acres to which water is to be *applied under the water use subject to transfer* are not exceeded," and *"[t]he use authorized under the water use subject to transfer* remains the same") (emphases added)).

1936). ORS 537.140 likewise reflects those features as elements, requiring that an application for an appropriative right—*i.e.*, an "application for a permit to appropriate water"—identify, *inter alia*, "the nature and amount of the proposed use; * * * the location and description of the proposed ditch, canal, or other work * * *; [and,] [i]f for agricultural purposes, * * * the legal subdivisions of the land and acreage to be irrigated * * *." ORS 537.140(1)(a)(C), (D), (I)(b).

Applied in situations like the present one, where the "water use subject to transfer" is "a water use established by * * * [a] water right certificate," ORS 540.510(1) thus authorizes the "holder" to change the elements of the certificated water right under which water is provided. In light of that fact, it is apparent that the interpretation asserted by Ken-Wal and the commission—*i.e.*, that the phrase "a water use established by * * * [a] water right certificate" refers only to the use of water provided under a certificate—assumes that the "holder" has authority to change the elements of a certificated water right in which the "holder" does *not* have an ownership interest. We cannot accept that interpretation. The more well-founded construction is that the phrase "a water use established by * * * [a] water right certificate" refers to the certificated water right itself, such that the "holder" is authorized to change the elements of a certificated water right in which the "holder" has an ownership interest.

■ To summarize, the "water use subject to transfer" involved in this case is the water use established by each certificate issued to the district. In turn, the statutory context supports the conclusion that the corresponding definition of the phrase "water use subject to transfer" in ORS 540.505(1)(b)—"a water use established by * * * [a] water right certificate"—refers to the certificated water right itself, not merely the use of the water provided under the certificate. That is, the context indicates that the "holder" must have an ownership interest in the *right to use* water established by a water right certificate, not merely an ownership interest in the use of the water provided under the certificate while the ownership of the water right resides with another party.

### 3. *The "Holder"*

Having determined that the phrase "holder of any water use subject to transfer" in this case refers to a party with an ownership interest in the water rights established by certificates 8942 and 8943, we must now address the pivotal question of which party is the "holder." To provide an answer, we examine the four grounds on which the parties rely in their competing claims to ownership: (1) the issuance of the water right certificates; (2) the trust relationship that exists between the district and Ken-Wal; (3) the beneficial use of the water provided under the certificates; and (4) the ownership of the appurtenant land.

#### a. Issuance of the Water Right Certificates

Numerous statutory provisions bear on the district's argument that it is the "holder of [a] water use subject to transfer"—*i.e.*, the party with an ownership interest in the water rights established by certificates 8942 and 8943—based on the issuance of those certificates.

As noted above, irrigation districts are authorized to own water rights:

> "The board [of directors] also has the right to *acquire* by lease, purchase, condemnation *or other legal means*, all lands, *water, water rights*, rights of way, easements and other property * * * necessary for the construction, *use, supply*, maintenance, repair and improvement of any canals and works proposed to be constructed by the board."

ORS 545.239(1) (emphases added). *See also* ORS 545.367 (authorizing board of directors to sell property "owned by the district and not required for district purposes," including "water or water rights"); ORS 537.099 (requiring annual water use reports from "any governmental entity that holds a water right," including "irrigation district[s] formed under ORS chapter 545 * * *"). Likewise, irrigation districts can obtain water right certificates in accordance with the procedures set forth in ORS chapter 537. *See, e.g.*, ORS 537.250(2) (describing issuance of water right certificates to irrigation districts); ORS 537.252(1) (same); ORS 540.510(4) (providing for application of "water used under a permit or certificate issued to a district" on nonappurtenant lands). The ORS

chapter 537 procedures identify the relationship between the ownership of a certificated water right and the issuance of a water right certificate.

■ Since enactment of the Water Rights Act in 1909, the ORS chapter 537 procedures constitute the exclusive means by which an irrigation district (or any other prospective appropriator) can acquire a "new" appropriative right, notwithstanding the ability of districts to obtain existing appropriative rights by lease, purchase, or condemnation. *See* ORS 537.120 ("[A]ll waters within the state may be appropriated for beneficial use, as provided in the Water Rights Act *and not otherwise* * * *." (emphasis added)); ORS 537.130(1) ("[A]ny person intending to acquire the right to the beneficial use of any of the surface waters of this state shall * * * make an application to the [department] for a permit to make the appropriation."); ORS 537.130(2) ("[A] person may not use, store or divert any waters until after the department issues a permit to appropriate the waters.").

This court has described the exclusive nature of the ORS chapter 537 procedures, and the relationship between those procedures and the method of acquiring appropriative rights that existed prior to their enactment, as follows:

"Prior to the water code of 1909[,] the appropriation of water in Oregon was recognized as a method of creating a vested interest in the waters of a stream. But the adoption of the water code introduced a new concept of establishing one's right to water. All waters in Oregon were declared to belong to the public subject to existing rights (ORS 537.110) and although such waters were declared to be subject to appropriation, they were appropriable only 'as provided in the Water Rights Act and not otherwise * * *.' (ORS 537.120.) Appropriation alone was no longer enough to establish a vested right in the waters of the state; the water code required, and still requires, the fulfillment of other conditions before a water right will vest in the appropriator. Various sections of the water code make this clear. The plan of the statute is to recognize vested rights in water not simply where there is an appropriation but when the 'appropriation has been perfected.' Thus ORS 537.250 provides that a water right certificate shall be issued upon it appearing to

the satisfaction of the State Engineer 'that an appropriation has been perfected in accordance with the provisions of the Water Rights Act.' "

*Green*, 254 Or at 430-31 (emphasis omitted). The process of obtaining a water right for irrigation purposes proceeds in stages, and, as described in *Green*, that process culminates in the department's issuance of a certificate to the applicant/permittee.

■ Initially, a party applies to the department for a permit to appropriate water, identifying, in part, the elements of the water right described above (amount, type, place of use, and point of diversion). ORS 537.140(1). If the department approves the application, it issues a permit authorizing the permittee to construct irrigation works and to "take all action required to apply the water to the designated beneficial use and to perfect the proposed appropriation." ORS 537.211(1). As described above, the permit itself does not represent a perfected and vested water right, even when the permitted water is put to beneficial use. *See Teel Irrigation Dist. v. Water Resources Dept.*, 323 Or 663, 667, 919 P2d 1172 (1996) ("The permit itself does not represent a perfected and vested water right."); *Green*, 254 Or at 430 ("It seems clear to us that the legislative assembly intended the water right certificate, not the permit, even when followed by a beneficial use, to mark the point at which the water right becomes vested.").

After the issuance of a water right permit, the "holder" of the permit is required to construct irrigation works with reasonable diligence, generally not to exceed five years. ORS 537.230(1), (3). Once construction is completed, ORS 537.230(4) provides that, (1) "upon completion of beneficial use * * *, the permittee shall hire a water right examiner * * * to survey the appropriation"; and (2) "[w]ithin one year after application of water to a beneficial use or the beneficial use date allowed in the permit, the permittee shall submit a map of the survey * * *, which shall accompany the request for a water right certificate * * *." If the permittee fails to complete the construction work or apply the permitted water to beneficial use in a timely manner, the permit

may be canceled. ORS 537.410(1). If the department determines that "an appropriation has been perfected in accordance with the provisions of the Water Rights Act," however, the department issues a certificate to the applicant/permittee. ORS 537.250(1).

To reiterate, ORS 537.250(3) describes the significance of the department's issuance of a water right certificate as follows:

> *"Rights to the use of water acquired under the provisions of the Water Rights Act, as set forth in a certificate* issued under subsection (1) of this section, *shall continue in the owner thereof* so long as the water shall be applied to beneficial use under and in accordance with the terms of the certificate * * *."

(Emphases added.) Likewise, citing ORS 537.250(3), this court previously has stated that "[t]he certificate represents a vested, perfected water right that continues so long as the water is applied to a beneficial use in accordance with the terms of the certificate * * *." *Teel Irrigation Dist.*, 323 Or at 668.

The foregoing context supports the conclusion that the party that holds an ownership interest in a certificated water right—*i.e.*, the "holder"—is the party that undertook the procedures in ORS chapter 537 that culminated in the issuance of the certificate. Stated differently, the department's issuance of a certificate appears to be the act that vests the ownership interest associated with a certificated water right in the party to which the certificate is issued. The contested certificates in this case reflect as much.

Certificates 8942 and 8943, and the documents leading up to the issuance of those certificates (the water right permit applications, water right permits, and proofs of appropriation), demonstrate that the district, not Ken-Wal, undertook the ORS chapter 537 procedures to acquire the associated water rights.[19] Both certificates state:

---

[19] Certificate 8943 and its preceding documents (the application for a water right permit, the water right permit, and the proof of appropriation) are not in the record. The originals of those documents are contained in the official files of the department. Accordingly, we take judicial notice of those documents, as they are not subject to reasonable dispute. *See* OEC 201(b)(2) (so permitting).

"This is to Certify, That FORT VANNOY IRRIGATION DISTRICT * * * has made proof to the satisfaction of the STATE ENGINEER of Oregon, of a right to the use of the waters of [Rogue River/Dutcher Creek] * * * for the purpose of [Irrigation] under [Permit No. 9692/9693] * * *, and that said right to the use of waters has been perfected in accordance with the laws of Oregon * * *."

The certificates then describe the elements of the certificated water rights, including the amount, type, place of use, and the point of diversion.

In sum, the fact that the district engaged in the statutory procedures that are the exclusive means for acquiring certificated water rights—which is unambiguously reflected in the certificates and the preceding documents—supports the conclusion that the district is the "holder" of the water rights established in certificates 8942 and 8943.[20] Notwithstanding that conclusion, Ken-Wal's beneficial use of the water provided under those certificates—as well as the permits that preceded those certificates—is an essential act in the creation and maintenance of the water rights, which is an important point that we consider below. Before turning to it, however, we analyze in more detail the district's ownership interests in the certificated water rights by examining the trust relationship between the parties and the implications of that relationship on the ownership interests.

b. Trust Relationship

The fact that certificates 8942 and 8943 were issued to the district subjects the ownership interest in each certificated water right to the parties' trust relationship. As noted above, that relationship is established in ORS 545.253, which provides that water rights acquired by an irrigation district pursuant to ORS 545.239 are trust property:

"The legal title to all property acquired under ORS 545.239 * * * shall immediately vest in the irrigation district and *shall be held by it in trust for and hereby is dedicated and set apart to the uses and purposes set forth in the*

_____

[20] *See East Jordan Irr. Co.*, 860 P2d at 313 (reasoning, in part, that shareholder in mutual water corporation did not own water rights because shareholder did not engage in statutory appropriation procedures).

*Irrigation District Law.* The board [of directors] is author-
ized and empowered to *hold, use,* acquire, *manage,* occupy,
*possess* and dispose of the property as provided in the Irri-
gation District Law."

ORS 545.253 (emphases added). Similarly, this court has
held that "[t]he relationship between an irrigation district
and its constituent landowners as to the water rights and
other property of such district is that of trustee and cestuis
que trustent."[21] *Smith v. Enterprise Irrigation Dist.,* 160 Or
372, 378-79, 85 P2d 1021 (1939).

The existence of the trust relationship bifurcates the
ownership interest in each certificated water right. *See Allen
v. Hendrick,* 104 Or 202, 223-24, 206 P 733 (1922) ("A trust
implies two estates;—one legal, and the other equitable; it
also implies that the legal title is held by one person, the trus-
tee, while another person, the *cestui que trust,* has the bene-
ficial interest * * *."). The district holds legal title to the
water right as trustee, and the members hold equitable title
as the beneficiaries. Acting in a fiduciary capacity, the dis-
trict's duties as trustee include management of the water
right and the water that it provides, and the members enjoy
the use of that water as their beneficial interest. *See* ORS
545.221(1)(c) ("The board [of directors] shall * * * [e]stablish
equitable bylaws, rules and regulations * * * for the distri-
bution and use of water among the landowners."); ORS
545.253 (authorizing board of directors to "hold, use, [and]
manage * * * property as provided in the Irrigation District
Law," including water and water rights acquired pursuant to
ORS 545.239); ORS 540.570(1) (authorizing district-initiated
temporary transfers in place of use for one irrigation season);
ORS 540.572(1), (2) (authorizing district-initiated permanent
transfers in place of use due to nonirrigability of appurtenant
land or lack of beneficial use).

The parties' roles and ownership interests under the
trust relationship inform our interpretation of the phrase
"holder of any water use subject to transfer" as applied in this

---

[21] "Cestui que trust" and "cestuis que trustent" are defined as, "[o]ne who pos-
sesses equitable rights in property * * * BENEFICIARY." *Black's Law Dictionary*
243 (8th ed 2004).

case. Those aspects of the trust relationship must be considered in light of the fact that ORS 540.510(1) authorizes the "holder" to make fundamental changes—*i.e.*, "change the use and place of use, the point of diversion or the use theretofore made of the water"—to the certificated water rights as trust property. Given that authority, notwithstanding Ken-Wal's equitable ownership interest, the phrase "holder of any water use subject to transfer" cannot be construed as referring to Ken-Wal, because such a construction would run afoul of the trust relationship by permitting a beneficiary to manage the trust property. In contrast, construing that phrase to refer to the district is consistent with the parties' trust relationship, because the changes that ORS 540.510(1) authorizes implicate the trustee's duty to manage the trust property for the sake of all of the beneficiaries.

 c. Beneficial Use

 Ken-Wal's and the commission's arguments regarding beneficial use—*i.e.*, that Ken-Wal is the "holder" of the water rights established in certificates 8942 and 8943 on the ground that it is the sole beneficial user of the water provided under those certificates—stand in sharp contrast to the conclusion supported by the analyses above. Beneficial use indeed is the foundation of an appropriative right. *See* ORS 540.610(1) ("Beneficial use shall be the basis, the measure and the limit of all rights to the use of water in this state."). Relatedly, beneficial use is essential to the acquisition and maintenance of certificated water rights. *See* ORS 537.230(4) (conditioning issuance of certificate on beneficial use of water under water right permit); ORS 537.250(3) (conditioning maintenance of certificated water rights on beneficial use under terms of certificate). Nonetheless, in the particular circumstances of this case, two aspects of the statutory context must be considered when evaluating the contentions of Ken-Wal and the commission that Ken-Wal is the "holder" on the ground of beneficial use.

 First, as previously explained, the ORS chapter 537 procedures require more than beneficial use to acquire a certificated water right. *See, e.g.*, ORS 537.130(1) (requiring submission of water right permit application to the department prior to actions effecting proposed appropriation); ORS

537.230(1) (requiring water right permit holder to construct irrigation works with reasonable diligence); ORS 537.230(4) (requiring survey of appropriation and submission of survey map and request for water right certificate); *Green*, 254 Or at 430-31 (describing vesting of water right under Water Rights Act requires fulfillment of conditions beyond appropriation itself). Those procedures demonstrate that the beneficial use of the water provided under permits 9692 and 9693 was a necessary, but not sufficient, condition for the acquisition of the water rights later established in certificates 8942 and 8943.[22] For its part, the district was responsible for constructing the irrigation works that channel water to Ken-Wal's land, as well as tending to the permit applications, the appropriation survey and survey map, and the requests for the water right certificates. Thus, beneficial use of the permitted water was only one action within the joint effort required to bring the certificated water rights into existence.

Second, relevant to both the acquisition and the subsequent maintenance of the certificated water rights, Ken-Wal's beneficial use of the water can be considered part of an agency relationship between it and the district. This court's case law and the provisions of the Water Rights Act and Irrigation District Law favor the existence of an agency relationship in these circumstances.

In a line of cases originating before the enactment of the Water Rights Act in 1909, this court has held that beneficial use may be accomplished through an agency relationship. The court stated early on in *Nevada Ditch Co.*:

"We take it, therefore, that the bona fide intention which is required of the appropriator to apply the water to some useful purpose may comprehend *a use to be made by or through another person * * *. Thus the appropriator is enabled to complete and finally establish his appropriation through the agency of the user.*"

---

[22] It is unclear from the record whether the permitted water was beneficially used by Ken-Wal or a predecessor or predecessors of Ken-Wal. That fact, however, is not essential to our conclusions that (1) the beneficial use of the permitted water was insufficient for acquisition of the certificated water rights; and (2) Ken-Wal's beneficial use of the certificated water is an inherent aspect of the district's ownership of the certificated water rights.

30 Or at 97 (emphasis added). The court has reiterated that view in several subsequent cases, most recently in *Wilber v. Wheeler*, 273 Or 855, 861-62, 543 P2d 1052 (1975):

"It was the plan of the water law of 1891, and runs all through the cases, that *an appropriation may be made by one person for the future use of another * * *.*"

*Id.* at 861-62 (quoting *In re Waters of Deschutes River*, 134 Or 623, 655, 286 P 563 (1929); citing *Re Water Rights of Hood River*, 114 Or 112, 137, 227 P 1065 (1924), and *Nevada Ditch Co.*, 30 Or at 89) (emphasis in original; internal quotation marks omitted).

Specifically, in prior cases involving disputes between water organizations (other than irrigation districts) and their patrons over the ownership of water rights, this court has held that beneficial use may be accomplished through an agency relationship. *See In re Waters of Walla Walla River*, 141 Or at 497-98 (concluding patrons acted as agents when applying water to beneficial use and irrigation company owned water rights); *Eldredge v. Mill Ditch Co.*, 90 Or at 596-97 (concluding mutual water company acted as agent of shareholders who put water to beneficial use and owned water rights).

The provisions of the Water Rights Act and the Irrigation District Law support the existence of an agency relationship between the district and Ken-Wal in this case. Three aspects of those provisions are relevant. First, as described above, both laws contain provisions demonstrating that districts can acquire and hold certificated water rights. ORS 537.250(2), (3); ORS 545.239(1); ORS 545.253. Second, the Water Rights Act hinges the acquisition and maintenance of certificated water rights on beneficial use. ORS 537.230(4); ORS 537.250(3). And, third, although the Irrigation District Law provides that districts may own land for the purposes of supplying and distributing certificated water, numerous provisions within that law demonstrate that it is the members (like Ken-Wal) that own the land on which such water is beneficially used.[23] *See, e.g.*, ORS 545.025(1) (identifying that purpose of an irrigation district is to enable owners

---

[23] In addition to providing water to the lands of their members, districts also may furnish water to "lands not included within the district" and "lands within the

of irrigable lands within proposed district's boundaries to provide for works necessary to irrigate their lands); ORS 545.221(1)(c) (requiring board of directors to "[e]stablish equitable bylaws, rules and regulations for the * * * distribution and use of water *among the landowners*" (emphasis added)); ORS 545.239(1) (authorizing board of directors to acquire (1) lands "*necessary for the construction, use, supply*, maintenance, repair and *improvement of any canals and works proposed to be constructed by the board*"; and (2) lands for reservoirs "for the storage of *needful waters, or for any other purpose reasonably necessary for the purposes of the district*" (emphases added)); ORS 545.253 (providing property acquired by district under ORS 545.239 "is dedicated and set apart to the uses and purposes set forth in the Irrigation District Law").[24]

Taken together, the foregoing provisions support the conclusion that an agency relationship exists between the district and Ken-Wal with respect to the water rights established in certificates 8942 and 8943. The district is authorized to acquire and hold those certificated water rights. Notwithstanding that authority, however, it is Ken-Wal, not the district, that owns the land on which the certificated water is beneficially used. Accordingly, if the statutory provisions authorizing the district to acquire and hold the certificated water rights are to be given effect, it is inherent in the parties' relationship that the district has maintained ownership of the certificated water rights through Ken-Wal's beneficial use of the certificated water. Put differently, because the district's ownership of the certificated water rights is dependent on the certificated water being put to beneficial use on Ken-Wal's land, it is inherent in the district's ownership of the certificated water rights that Ken-Wal acts as its agent. To hold that Ken-Wal is the "holder of [a] water use subject to transfer" on the ground of beneficial use in this case would be

---

district [that are] not subject to assessment by the district," upon receiving proper compensation. ORS 545.271.

[24] *See also* ORS 540.572(2) (authorizing district to seek permanent transfer of water right under ORS 540.574 if a "water user of a district" has not beneficially used water for five years); ORS 540.574(3) (requiring petition for district-initiated permanent transfer of water right to include "names of all users within the district" to and from whose land water rights are to be transferred).

to eviscerate the district's statutory authority to own certificated water rights.

In our view, Ken-Wal's beneficial use of the water provided under certificates 8942 and 8943 does not undermine the conclusion that the district is the "holder of [a] water use subject to transfer" relevant to the water rights established in those certificates. Beneficial use of the permitted water was insufficient alone to bring the water rights into existence under ORS chapter 537. Moreover, the court's longstanding case law and the statutory provisions discussed above demonstrate that the parties participate in an agency relationship whereby the district has maintained ownership of the certificated water rights through Ken-Wal's beneficial use of the certificated water. We now turn to Ken-Wal's and the commission's final argument regarding the ownership of the appurtenant land.

### d. Ownership of the Appurtenant Land

Like their contentions regarding beneficial use, the arguments of Ken-Wal and the commission regarding the ownership of the appurtenant land—*i.e.*, that Ken-Wal is the "holder" of the water rights established in certificates 8942 and 8943 because it owns a portion of the land to which those water rights are appurtenant—also run contrary to the conclusion that the district is the "holder" based on the issuance of the certificates and the parties' trust relationship. The certificated water rights are appurtenant to the land on which the certificated water is applied to beneficial use. *See* ORS 540.510(1) ("[A]ll water used in this state for any purpose shall remain appurtenant to the premises upon which it is used * * *."). That said, the argument that the ownership of a certificated water right is controlled by the ownership of the appurtenant land must be considered in light of the statutory context.

For over a century, this court's cases interpreting the Water Rights Act and its predecessors repeatedly have rejected the proposition that the ownership of the appurtenant land is coextensive with the ownership of the appropriative rights under which water is provided thereto. As referred to earlier in relation to beneficial use, *Wilber* provides a thorough recitation of that legal principle.

"There is nothing in ORS ch 537 which would prevent someone from applying for water rights to land which they do not own but do intend to irrigate. As this court stated in *In re Waters of Deschutes River*, 134 Or 623, 655, 286 P 563 (1929), *reh denied* and *opinion modified*, 249 P 1049 (1930):

> " 'It was the plan of the water law of 1891, and runs all through the cases, that *an appropriation may be made by one person for the future use of another; and for the future use upon lands which the appropriator does not then own, or which he does not contemplate owning and which he never does own.* It is sufficient for the validity of the appropriation if the original intention is, that the water filed upon is for use upon certain lands then definitely had in mind, and it is reasonably anticipated that when the diversion is ultimately completed and the water ready for application to that land, or other land or uses which have been substituted for the originally considered and intended land, such land will be then, or with reasonable diligence thereafter ready to receive it: [Nevada Ditch Co., 30 Or at 89; Re Water Rights of Hood River, 114 Or at 137-38].' (Emphasis added.)

> *"Under our statute, it is clear that water rights are appurtenant to the land, and not to ownership of the land which changes hands frequently. See ORS 540.510."*

*Wilber*, 273 Or at 861-62 (additional emphasis added).

█ *Wilber* illustrates that, relevant to ORS chapter 537 and the appropriation procedures that preceded its enactment, the longstanding rule in Oregon is that the ownership of an appropriative right (*e.g.*, a certificated water right) may reside with a party that does *not* own the appurtenant land. Put differently, a party's ownership of the appurtenant land does not necessarily entail its ownership of the associated certificated water right. In at least some situations, the ownership of a certificated water right will reside with one party while the ownership of the appurtenant land resides with another. Such is the circumstance in this case. Although Ken-Wal enjoys the use of the water provided under certificates 8942 and 8943 by virtue of its ownership of a portion of the appurtenant land, that ownership does not dictate that Ken-Wal also owns the certificated water rights. Rather, for the reasons described above, the statutory context compels

the conclusion that the district acquired the legal ownership interest in the certificated water rights when undertaking the ORS chapter 537 procedures, and Ken-Wal enjoys the use of the certificated water on its lands as a beneficiary in the parties' trust relationship.

## IV. CONCLUSION

Because the text of ORS 540.510(1) and the statutory context render the meaning of the phrase "holder of any water use subject to transfer" unambiguous, our analysis need not proceed further. The phrase "holder of [a] water use subject to transfer" connotes a party with an ownership interest. Construing the term "water use subject to transfer" in this case as the right to use water established by certificates 8942 and 8943, we hold that the district is the "holder" of those certificated water rights. The requisite ownership interest in those rights vested in the district as trustee upon issuance of the certificates. Ken-Wal's beneficial use has enabled the district's ownership of the water rights through an agency relationship. Ken-Wal's ownership of a portion of the appurtenant land does not equate with ownership of the certificated water rights. Ultimately, because we conclude that Ken-Wal is not the "holder" of the water rights established in certificates 8942 and 8943, Ken-Wal is not authorized under ORS 540.510(1) to change the associated points of diversion without the district's consent.

The decision of the Court of Appeals is affirmed. The order of the Water Resources Commission is reversed, and the case is remanded to the commission for further proceedings consistent with this opinion.