Argued and submitted August 30, 2018, affirmed June 10, petition for review allowed October 22, 2020 (367 Or 217)
See later issue Oregon Reports

WATERWATCH OF OREGON,
*Petitioner-Appellant,*

*v.*

WATER RESOURCES DEPARTMENT,
*Respondent-Respondent,*

*and*

WARM SPRINGS HYDRO LLC,
*Intervenor-Respondent.*

Marion County Circuit Court
16CV11938; A165160

468 P3d 478

WaterWatch of Oregon (WaterWatch) appeals from a judgment of the circuit court that denied its petition for judicial review of actions by Oregon's Water Resources Department (WRD) concerning water rights on Rock Creek, a tributary of the Powder River. For nearly a century, a water right certificate issued by the state allowed the holder of that certificate to use water from the creek to generate power, and a dam on the creek diverted water to a power plant for that purpose. In 1995, the power plant shut down and the power company stopped diverting the water, eventually resulting in this dispute over what should happen to the water right once it was no longer being used for hydroelectric purposes. According to WaterWatch, ORS 543A.305(3) requires WRD to convert the hydroelectric water right to an in-stream right permanently held in trust for the public. That statute provides that water rights associated with a hydroelectric project shall be converted to a permanent in-stream water right for the public trust "[f]ive years after the use of water under a hydroelectric water right ceases." WRD and the holder of the water right certificate, Warm Springs Hydro LLC (Warm Springs), contend that conversion under ORS 543A.305(3) was never triggered because the water right had been used for in-stream use under a lease arrangement that, although itself not a hydroelectric use, nonetheless is a "use of water under a hydroelectric water right" during the relevant five-year period. The circuit court, agreeing with the position taken by WRD and Warm Springs, ruled in their favor and against WaterWatch on cross-motions for summary judgment. On appeal, WaterWatch argues that the circuit court erroneously construed ORS 543A.305(3). *Held*: The legislature intended the phrase "use of water under a hydroelectric water right" in ORS 543A.305(3) to include a beneficial in-stream use of water pursuant to the lease of a hydroelectric water right that occurs during the relevant five-year period, even though that use is not itself for the purpose of generating power.

Affirmed.


Audrey J. Broyles, Judge.

Thomas M. Christ argued the cause for appellant. Also on the briefs were Cosgrave Vergeer Kester LLP and Brian J. Posewitz.

Denise G. Fjordbeck argued the cause for respondent Oregon Water Resources Department. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Crystal S. Chase argued the cause for respondent Warm Springs Hydro LLC. Also on the brief were David E. Filippi and Stoel Rives LLP.

Before Ortega, Presiding Judge, and Egan, Chief Judge, and Powers, Judge.*

POWERS, J.

Affirmed.

_____

* Egan, C. J., *vice* Garrett, J. pro tempore.

**POWERS, J.**

WaterWatch of Oregon (WaterWatch) appeals from a judgment of the circuit court that denied its petition for judicial review of actions by Oregon's Water Resources Department (WRD) concerning water rights on Rock Creek, a tributary of the Powder River. For nearly a century, a water right certificate issued by the state allowed the holder of that certificate to use water from the creek to generate power, and a dam on the creek diverted water to a power plant for that purpose. In 1995, the power plant shut down and the power company stopped diverting the water. This dispute later arose over what should happen to the water right once it was no longer being used for hydroelectric purposes.

The dispute involves the interplay between two statutes, ORS 543A.305 and ORS 537.348. The former was enacted in 1999, four years after the power plant shut down. It provides that water rights associated with a hydroelectric project shall be converted to a permanent in-stream water right for the public trust "[f]ive years after the use of water under a hydroelectric water right ceases." ORS 543A.305(3). In early 2000, just short of five years after the power plant shut down, the power company entered into a lease with the State of Oregon to temporarily convert its hydroelectric water right to an in-stream right under ORS 537.348, which predates ORS 543A.305 and authorizes the lease of "all or a portion of an existing water right * * * for conversion to an in-stream water right." The question presented by this case is whether that in-stream lease under ORS 537.348 is a "use of water under a hydroelectric water right" as that phrase is used in ORS 543A.305(3).

WaterWatch contends that, because the use of water for hydroelectric purposes ceased when the plant shut down, the text of ORS 543A.305(3) requires WRD to convert the hydroelectric water right to an in-stream right permanently held in trust for the public, regardless of any other in-stream use that was made thereafter. WRD and the holder of the water right certificate, Warm Springs Hydro LLC (Warm Springs), argue that conversion under ORS 543A.305(3) was never triggered because in-stream use under the lease

arrangement, although itself not a hydroelectric use, none-theless is a "use of water under a hydroelectric water right" during the relevant five-year period.

The circuit court, agreeing with the position taken by WRD and Warm Springs, ruled in their favor and against WaterWatch on cross-motions for summary judgment. For the reasons that follow, we likewise conclude that the legis-lature intended the phrase "use of water under a hydroelec-tric water right" in ORS 543A.305(3) to include a beneficial in-stream use of water pursuant to the lease of a hydroelec-tric water right that occurs during the relevant five-year period, even though that use is not itself for the purpose of generating power. We therefore affirm the judgment of the circuit court.

## I.   BACKGROUND

### A.   *Oregon's Water Laws Concerning In-Stream Use*

To better frame the historical events giving rise to this appeal, we begin with a brief summary of the legal con-text in which those events occurred.

#### 1.   *Beneficial Use, Forfeiture, and Transfer*

Historically, two different doctrines governed Oregon's laws regarding the use of surface water (*i.e.*, water from streams and lakes): the riparian doctrine, in which use was based on a party's ownership of land adjacent to the water source, and the prior appropriation doctrine, which derived from a party's beneficial use of the water appropri-ated from the source, regardless of ownership of the riparian land. *See generally Fort Vannoy Irrigation v. Water Resources Comm.*, 345 Or 56, 64-67, 188 P3d 277 (2008) (describ-ing the history of the doctrine of prior appropriation in Oregon).

In 1909, Oregon enacted the Water Rights Act, which marked "the ascendancy of the appropriation doctrine as the prevailing water law of Oregon." *Id.* at 64. The act provides that "[a]ll water within the state from all sources of water supply belongs to the public," ORS 537.110, and that, subject to existing rights and certain exceptions, "all waters within the state may be appropriated for beneficial

use, as provided in the Water Rights Act and not otherwise[.]" ORS 537.120; *see* ORS 540.610(1) ("Beneficial use shall be the basis, the measure and the limit of all rights to the use of water in this state."); *Fort Vannoy Irrigation*, 345 Or at 87 (observing that, under the Water Rights Act, beneficial use remains "the foundation of an appropriative right").

For water rights that existed before 1909, the Water Rights Act provides that a "riparian proprietor" has "a vested right to the extent of the actual application to beneficial use; provided, such use has not been abandoned for a continuous period of two years." ORS 539.010. The act also provides a process for formally adjudicating existing rights, which includes circuit court review and, upon final determination of those rights, the issuance of a water right certificate—that is, "a certificate setting forth the name and post-office address of the owner of the right; the priority of the date, extent and purpose of the right, and if the water is for irrigation purposes, a description of the legal subdivisions of land to which the water is appurtenant." ORS 539.140.

For water rights created after 1909, "[a]ppropriation alone was no longer enough to establish a vested right in the waters of the state; the water code required, and still requires, the fulfillment of other conditions before a water right will vest in the appropriator." *Green v. Wheeler*, 254 Or 424, 430, 458 P2d 938 (1969), *cert den*, 397 US 990 (1970). Under the Water Rights Act, an appropriation needs to be "perfected," at which time the state issues a water right certificate of the same character as that described in ORS 539.140. *See* ORS 537.250.

Once a water right certificate issues, the rights described in it continue "so long as the water shall be applied to a beneficial use" under and in accordance with the terms of the certificate. ORS 537.250(3). Importantly, the corollary is that water rights can be forfeited when they are not put to a beneficial use. *See* ORS 537.250(3)(a) (providing that water rights are subject to forfeiture under ORS 540.610); ORS 540.610(1) (providing for forfeiture of all or part of the

water right after five-year period of nonuse). In that case, the water that was the subject of the right "shall revert to the public and become again the subject of appropriation in the manner provided by law, subject to existing priorities." ORS 540.610(5).

Under Oregon law, the default rule is that water rights run with the land, not ownership of the land. *Wilber v. Wheeler*, 273 Or 855, 862, 543 P2d 1052 (1975) ("Under our statute, it is clear that water rights are appurtenant to the land, and not to ownership of the land which changes hands frequently."). Water rights, however, can be transferred by the holder without losing priority or forfeiting the right, and the use of the water can be changed, so long as the required statutory procedures are followed. *See* ORS 540.510(1) (providing that "the holder of any water use subject to transfer may, upon compliance with the provisions of ORS 540.520 and 540.530, change the use and place of use, the point of diversion or the use theretofore made of the water in all cases without losing priority of the right theretofore established").

2. *In-Stream Water Rights*

Beneficial uses of water are often described either as "consumptive," meaning that they are used in a product or lost to the atmosphere (for example, irrigation), or as "nonconsumptive," meaning that the water remains in or is returned to the stream. *See generally* Anthony Dan Tarlock & Jason Anthony Robison, *Law of Water Rights and Resources*, Water Usage—Categories of Use, § 2.9 (July 2019 Update). Beginning in the 1950s, and then later as part of conservation efforts in the 1980s, the Oregon legislature enacted statutes to ensure, among other conservation efforts, that consumptive uses did not jeopardize minimum perennial stream flows in the state's waters. *See generally* Joseph Q. Kaufman, *An Analysis of Developing Instream Water Rights in Oregon*, 28 Willamette L Rev 285, 305 (1992) (describing that history).

In 1987, as part of that effort, the legislature created a new type of water right: the "in-stream water right," defined as "a water right held in trust by the Water

Resources Department for the benefit of the people of the State of Oregon to maintain water in-stream for public use." Or Laws 1987, ch 859, § 2. The newly enacted statutes declared that "[p]ublic uses are beneficial uses," *id.* at § 3, and set up different ways that an "in-stream water right" could be created, including by purchase, lease, or gift of an existing water right. *Id.* at § 9. That process, which was codified as ORS 537.348, provided:

> "(1)  Any person may purchase or lease an existing water right or portion thereof or accept a gift of an existing water right or portion thereof for conversion to an in-stream water right. Any water right converted to an in-stream water right under this section shall retain the priority date of the water right purchased, leased or received as a gift. At the request of the person[,] the Water Resources Commission shall issue a new certificate for the in-stream water right showing the original priority date of the purchased, gifted or leased water right. A person who transfers a water right by purchase, lease or gift under this subsection shall comply with the requirements for the transfer of a water right under ORS 540.510 to 540.530.

> "(2)  Any person who has an existing water right may lease the existing water right or portion thereof for use as an in-stream water right for a specified period without the loss of the original priority date. During the term of such lease, the use of the water right as an in-stream water right shall be considered a beneficial use."

*Id.* at § 9.

The 1987 amendments further provided that, after a new certificate was issued, the in-stream right would be treated like other water rights: "[T]he in-stream water right shall have the same legal status as any other water right for which a certificate has been issued." *Id.* at § 10. And, like other water rights, an in-stream water right can be forfeited through nonuse, pursuant to the forfeiture provisions described in ORS 540.610 to 540.650. *See id.* at § 10.

3.  *Hydroelectric Projects and In-stream Water Rights*

Under the priority system of the Water Rights Act (and laws predating it), the diversion of water to generate

power is considered a beneficial use of water.[1] For those rights created after 1909, the Water Rights Act provided that certificates issued for rights to the use of water for power development were time-limited. *See* Or Laws 1909, ch 216, § 53 (limiting water right certificates to 40 years from date of application).

In 1931, the legislature created a new regulatory framework for licensing hydroelectric projects. *See* ORS 543.110 (providing that, after February 26, 1931, no right to appropriate or to use for power development shall be initiated, perfected, acquired or held "except for and during the periods or extensions thereof stated in ORS 543.010 to 543.610, and pursuant to the provisions thereof").[2] The licenses for any new projects were limited to 50 years or upon the expiration of a Federal Energy Regulatory Commission (FERC) license. *See* ORS 543.260 (so providing).

In the 1990s, the legislature recognized that many of the time-limited water rights and licenses for hydroelectric projects would soon expire. *See* ORS 543A.010 (setting

---

[1] *See* ORS 537.160(1), (3); ORS 537.170(8)(a) (referring to "the highest use of the water for all purposes, including irrigation, domestic use, municipal water supply, power development, public recreation, protection of commercial and game fishing and wildlife, fire protection, mining, industrial purposes, navigation, scenic attraction or any other beneficial use to which the water may be applied for which it may have a special value to the public"); ORS 537.283 (providing for the Water Resources Commission to set up procedures for processing applications to appropriate water for hydroelectric purposes and referring to "other beneficial uses"); *accord* ORS 541.110 ("The use of the water of the lakes and running streams of Oregon for the purpose of developing the mineral resources of the state and to furnish electric power for all purposes, is declared to be a public and beneficial use and a public necessity. Subject to the provisions of the Water Rights Act (as defined in ORS 537.010), the right to divert unappropriated waters of any such lakes or streams for such public and beneficial use is granted."); *see also Grande Ronde Elec. Co. v. Drake*, 46 Or 243, 245, 78 P 1031 (1905) ("The use of water of streams in this state for the purpose of furnishing electrical power for all purposes is declared to be beneficial and a public necessity, and the right to divert unappropriated water therefrom for such use is granted. All corporations having title or possessory right to any land shall be entitled to the use and enjoyment of the water of any stream within the State, to furnish electrical power for any purposes, so that such use of the same does not materially affect or impair the rights of prior appropriations." (Citations and internal quotation marks omitted.)).

[2] *See also* ORS 543.120 ("After February 26, 1931, no water power project involving the use of the waters of lakes, rivers, streams or other bodies of water within this state, including waters over which this state has concurrent jurisdiction, for the generation of electricity, shall be begun or constructed except in conformity with the provisions of ORS 543.010 to 543.610.").

forth legislative findings and describing task force). Because state law did not then "prescribe a means for reauthorizing the use of water for hydroelectric purposes," the legislature created a hydroelectric task force to recommend a process and standards for a coordinated state review of existing facilities. *Id*. In 1997, the legislature passed a sweeping bill concerning reauthorization of hydroelectric projects, including a process for filing with WRD a "reauthorization application for a water right for the use of water for hydroelectric purposes." ORS 543A.035(2).

The following session, based on recommendations of the task force, the legislature again addressed hydroelectric projects—specifically, the decommissioning of hydroelectric projects. In a bill that included what became ORS 543A.305(3), the legislature created a process for permanently converting certain hydroelectric water rights to in-stream water rights for the public trust:

> "Five years after the use of water under a hydroelectric water right ceases, or upon expiration of a hydroelectric water right not otherwise extended or reauthorized, or at any time earlier with the written consent of the holder of the hydroelectric water right, up to the full amount of the water right associated with the hydroelectric project shall be converted to an in-stream water right, upon a finding by the Water Resources Director that the conversion will not result in injury to other existing water rights. In making the evaluation, the director shall consider the actual use of the hydroelectric project and the resulting impacts on actual use by other existing water rights as of [October 23, 1999]. The director may include mitigation measures as conditions of the in-stream water right to avoid injury and to ensure the continuation of authorized water uses by other existing water rights."

Or Laws 1999, ch 873, § 2(3).

B.  *Historical Facts*

With that background, we turn to the historical facts giving rise to this appeal, which are few and undisputed. Around 1905 (four years before the enactment of the Water Rights Act), a developer constructed a hydroelectric project in eastern Oregon on Rock Creek, which flows into

the Powder River. In 1923, the state issued a water right certificate to the company operating the project, Eastern Oregon Light & Power Company, memorializing its right to divert water at the rate of 13 cubic feet per second for hydroelectric power. In 1946, FERC issued a 50-year license for the project, which was transferred in 1988 to Oregon Trail Electric Consumers (Oregon Trail).

Oregon Trail later determined that the project was unlikely to be profitable, so it shut down the project and stopped diverting water in March 1995. The following year, the 50-year FERC license for the project expired. By 2003, FERC had approved the surrender of the FERC license and most of the power project, including the dam used to divert water, had been removed.

In the meantime, in February 2000, after ORS 543A.305 was enacted but not quite five years after it had stopped diverting water for power, Oregon Trail entered into a lease agreement with the State of Oregon under ORS 537.348 for an in-stream water right. The agreement, referred to as L-108, provided that "lessor agrees to lease the subject portion of the water right [on Rock Creek] for instream use for the term of this Agreement [until December 2000] to Lessee and Trustee, the Oregon Water Resources Department, pursuant to the provisions of ORS 537.348(2) and OAR 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 [(the rule addressing processing of in-stream leases)]." WRD issued a final order approving L-108 in late February 2000, concluding that "the lease is consistent with the requirements of ORS 537.348."

Thereafter, the in-stream lease was renewed on multiple occasions. WRD approved a renewal in July 2005 for a term ending December 2009. In February 2010, WRD approved a renewal for a term ending in December 2011. Warm Springs then acquired the water right certificate and other property related to the hydroelectric project in July 2015, and it applied for another renewal of the lease. WRD approved that renewal in October 2015 for a period ending on December 31, 2020.

WaterWatch, concerned that Warm Springs intended to restart the hydroelectric project at the conclusion of the

lease, petitioned WRD to reconsider its order approving the last renewal. According to WaterWatch, the temporary in-stream leases were an attempt to circumvent the permanent conversion process created by the legislature in 1999, and WRD was required under ORS 543A.305(3) to begin that conversion process rather than approve another temporary lease. WRD did not act on the petition, and it was deemed denied in February 2016.

At that point, WaterWatch petitioned the circuit court (1) for judicial review of WRD's approval of the lease renewal and (2) for the court to compel WRD to initiate the conversion process set forth in ORS 543A.305(3). *See* ORS 536.075(1) (providing for judicial review in the circuit court of a final order in other than contested cases issued by the Water Resources Commission or WRD). Both claims were based on its view that "the use of water under a hydroelectric water right ceases" within the meaning of that statute once the water is no longer being used to generate power (in this case, 2003 at the very latest), regardless of whether it has thereafter been used for a different beneficial purpose under an in-stream lease. Warm Springs intervened in the action, and the parties—WaterWatch on one side, and WRD and Warm Springs on the other—filed cross-motions for summary judgment with regard to the interpretation and application of ORS 543A.305(3).

The circuit court agreed with the arguments made by WRD and Warm Springs. The court concluded that "[t]he phrase 'use of water' must be read in the context of Oregon's statutory scheme for water appropriation," and that "[t]he only recognized 'use' under that statutory scheme is 'beneficial use' of water to include in-stream use of water under a lease." The court therefore granted summary judgment in favor of WRD and Warm Springs, denied WaterWatch's motion, and entered a judgment dismissing the action.

## II.   DISCUSSION

WaterWatch appeals from that judgment, assigning error to the court's rulings on the cross-motions for summary judgment. Those rulings turned on the court's construction of ORS 543A.305, which presents a question of

law. *See Bundy v. NuStar GP, LLC*, 362 Or 282, 287 n 6, 407 P3d 801 (2017). To construe the statute, we apply the methodology described in *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009), examining the statute's text and context, and then considering legislative history to the extent that we find it helpful.

The text at the heart of the dispute appears in the first sentence of ORS 543A.305(3): "Five years after the use of water under a hydroelectric water right ceases ∗ ∗ ∗." WaterWatch argues, as it did before the circuit court, that the phrase "use of water under a hydroelectric water right" refers to one type of use and only that use: hydroelectric use. Although that is a plausible reading of the text in isolation, it does not account for its broader context or the legislative history of the statute.

As we described when setting out the background of Oregon's water laws, the "use of water" and a "water right" are related but not synonymous concepts. The term "use" is not statutorily defined for purposes of ORS 543A.305, but it has a specialized meaning in the context of Oregon's water laws. *See State v. Villagomez*, 362 Or 390, 395-96, 412 P3d 183 (2018) (explaining that, when a term has acquired a specialized, well-defined legal meaning, courts will presume that the legislature intended that meaning). "Use" in ORS 543A.305 refers to a beneficial use of water. *See, e.g.*, ORS 540.610(1) ("Beneficial use shall be the basis, the measure and the limit of all rights to the use of water in this state."); ORS 541.110 ("The use of the water of the lakes and running streams of Oregon for the purpose of developing the mineral resources of the state and to furnish electric power for all purposes, is declared to be a public and beneficial use and a public necessity.").

Had the legislature placed the modifier "hydroelectric" in front of "use," then the statute's text would support WaterWatch's argument—to refer to only one type of beneficial use: the use of water for hydroelectric purposes. The legislature, however, did not do so; rather, the term "hydroelectric" appears in front of the term "water right."

The statutory framework does not define the term "hydroelectric water right," but context provides clues as to

the meaning of that phrase. For one, a "hydroelectric water right" is something that has a "holder." *See* ORS 543A.305(3) ("with the written consent of the holder of the hydroelectric water right"). A "holder," in turn, is defined in the statute as "a person authorized to operate a hydroelectric project under the authority of either a time-limited water right, a certificated water right or a pre-1909 uncertificated claim. 'Holder' includes licensees, power claimants, uncertificated claimants and water right claimants." ORS 543.075(2); *see also* ORS 543A.305(1)(a) (providing that "holder" has "the meaning given that term in ORS 543.075"). Those three categories—time-limited water rights, certificated water rights, and pre-1909 uncertificated claims—are consistent with the recognition of different types of water rights after the 1909 Water Rights Act, discussed above. 304 Or App at 621-22.

The remainder of ORS 543A.305(3) similarly suggests that a "hydroelectric water right" refers to the source of authority for use rather than describing the use itself. It provides that the "hydroelectric water right" shall be converted to an in-stream water right "up to the full amount of the water right associated with the hydroelectric project." In other words, a "hydroelectric water right" is a shorthand reference for a water right that is associated with a hydroelectric project.

Other provisions support that understanding. A "hydroelectric water right" is something that can be "amended" by WRD at the request of the holder, ORS 543.092(1); it is something that can "expire," ORS 543A.305(3); and it is something that can be "time-limited" and also "transferred," ORS 543A.305(7). All of those references suggest that a "hydroelectric water right" refers to the source of authority by which a holder uses water in association with a hydroelectric project, as opposed to limiting the purpose for which it is used.[3]

---

[3] The term "water right," which appears throughout ORS chapter 543A, is partially defined in ORS 543A.005(8), which provides that "'[w]ater right' includes the use of water for hydroelectric purposes pursuant to a license issued under ORS 543.260"—the licensing statute for hydroelectric projects. But that definition, which predated ORS 543A.305, is inclusive rather than exhaustive. *See AFSCME Council 75 v. City of Lebanon*, 360 Or 809, 821-22, 388 P3d 1028

There is another strong contextual clue that the broader phrase "use under a hydroelectric water right" is not synonymous with "hydroelectric use." ORS 543A.305(6) confirms that the legislature was aware that certain water rights associated with hydroelectric projects would have more than one beneficial use—and that not all usage would be for hydroelectric purposes: "If hydroelectric production is not the sole beneficial use authorized by a water right, this section shall apply only to conversion of that portion of the water right used exclusively for hydroelectric purposes."

Viewed in that context, the phrase "use under a hydroelectric water right" is not limited to hydroelectric use. The legislature plainly knew how to refer to use "for hydroelectric purposes" to narrow the type of an acceptable use but did not do so in the first sentence of ORS 543A.305(3). Instead, ORS 543A.305(3) refers to "use under a hydroelectric water right," which encompasses any beneficial use that is authorized by a water right associated with a hydroelectric project.

With that understanding of the text in context, we conclude that use as an in-stream water right pursuant to ORS 537.348 qualifies as "use under a hydroelectric water right." At the time that ORS 543A.305 was enacted, ORS 537.348 authorized any person with an existing water right to "lease the existing water right or portion thereof for use as an in-stream water right for a specified period without the loss of the original priority date," and it further provided that, "[d]uring the term of such lease, the use of the water right as an in-stream water right shall be considered a beneficial use." ORS 537.348(2) (1999), *amended by* Or Laws 2001, ch 205, § 1. Relatedly, ORS 537.350 provided that, "[a]fter the Water Resources Commission issues a certificate for an in-stream water right under ORS 537.341 to 537.348, the in-stream water right shall have the same legal status as any other water right for which a certificate has been

(2017) (explaining that the legislature's use of "includes" rather than "means" signals a nonexclusive definition). "Water right" generally is a term of art referring to an appropriative right to put water to a beneficial use. *Accord Boyce v. Killip*, 184 Or 424, 436, 198 P2d 613 (1948) (explaining that "water right" is a term of art that generally refers to "a right to divert water by artificial means from a natural stream or a spring").

issued." We have no reason to believe that, in light of those provisions, the legislature nonetheless intended to treat use pursuant to an in-stream lease differently from other beneficial uses for purposes of ORS 543A.305(3).

In arguing to the contrary, WaterWatch attempts to draw a distinction in the statute between "permanent" and "temporary" transfers, pointing to ORS 543A.305(7). That subsection provides, "This section shall not apply if the holder, at any time prior to conversion under subsection (3) of this section, transfers the hydroelectric water right under ORS 540.520 and 540.530 * * *." According to WaterWatch, "[t]he subsection (7) exception conspicuously omits transfers under ORS 540.523, which regulates temporary transfers," and in-stream leases under ORS 537.348(2) "are really just a type of temporary transfers." (Emphasis omitted.)

We are not persuaded by that argument. Most importantly, ORS 540.523 did not exist when in-stream leases under ORS 537.348 were created in 1987, and there is no evidence that the legislature, when it enacted ORS 543A.305 in 1999, would have understood an in-stream lease to be a "temporary transfer" under ORS 540.523. That statute, which was enacted in 1995, concerns a specific type of transfer—"the temporary transfer of place of use and, if necessary to convey water to the new temporary place of use, temporarily change the point of diversion or point of appropriation for a period not to exceed five years." It has no readily discernable application to transfers that leave water in-stream.

Nor is there any other contextual support for drawing the "temporary" versus "permanent" transfer distinction in ORS 543A.305 that WaterWatch urges. At the time that the transfer exception in ORS 543A.305(7) was enacted, a related statute provided that "no change in use or place of use of any water for any purpose may be made without compliance with the provisions of ORS 540.520 and 540.530." ORS 540.510 (1999), *amended by* Or Laws 2003, ch 705, § 8. And ORS 537.348(1) provided that "[a] person who transfers a water right by purchase, lease or gift under this subsection shall comply with the requirements for the transfer of a water right under ORS 540.505 to 540.580." ORS 537.348(1)

(1999), *amended by* Or Laws 2001, ch 205, § 1. That historical context cuts against WaterWatch's purported distinction and, if anything, suggests that the transfer exception would have been understood to apply to all transfers, temporary or permanent.

To the extent that the text and context of ORS 543A.305(3) leave any doubt about whether use under an in-stream lease would be sufficient to avoid permanent conversion of the water right to in-stream use under that statute, there is legislative history on point. The bill that resulted in ORS 543A.305(3), House Bill (HB) 2162, was the product of a hydroelectric task force, which produced a report that was presented to the legislature. The Task Force Report included an executive summary of "What the Bill Does." Report to the 70th Legislative Assembly, HB 2162, Hydroelectric Task Force, April 1999 at 1 (Task Force Report). That summary stated, "Provides for disposition of the water right in cases when the right ceases to be used for hydroelectric or other purposes." *Id*.

The bill, according to the Task Force Report, was concerned with "the potential disruptive effects on other users and to in[-]stream benefits if a hydroelectric water right was no longer exercised. A task force goal was to protect the status quo and attempt to enhance affected resources." Task Force Report at 3. During a committee hearing on the bill, Martha Pagel, Director of the Oregon Water Resources Commission, further explained the effort to maintain the status quo and pointed out that conversion would only occur if the holder of the water right did not make other arrangements before decommissioning. In the process, she expressly referred to voluntary transfers to other in-stream use:

> "Under this measure, if other provisions aren't made in the very near future, five years from the time that the project is ultimately decommissioned [by the owner of the dam], this would allow for the conversion of that existing water right to an in-stream right. But even without the bill, the owner of the license right now, the water right, now could accomplish a transfer to a similar nonconsumptive use, like in-stream use. They could do that voluntarily under existing transfer procedures. This bill would give a

process that would come into play if they didn't make other provisions for that kind of a transfer."

Audio Recording, Joint Committee on Ways and Means, Natural Resources Subcommittee, HB 2162, July 8, 1999, at 00:53.10, http://records.sos.state.or.us/ORSOSWebDrawer/Record/4227848# (accessed Apr 15, 2020). Those existing transfer procedures included ORS 537.348.

In sum, based on the text, context, and history of ORS 543A.305(3), we agree with the circuit court's conclusion that "use under a hydroelectric water right" is not limited to the use of water for hydroelectric purposes but encompasses other beneficial uses authorized by a hydroelectric water right, including in-stream use under a lease of that right.

We next turn briefly to WaterWatch's alternative argument, *viz.*, even if use under an in-stream lease qualifies as "use under a hydroelectric water right," conversion under ORS 543A.305(3) was nonetheless triggered because there were points more than five years ago (in fact, multiple periods) during which time there was neither hydroelectric use nor in-stream use. According to WaterWatch, any "use" had "ceased" at those points, and the fact that it later resumed or restarted within five years was irrelevant under the plain text of ORS 543A.305.

Suffice it to say that we are not persuaded by that construction of the statute. The natural reading of the relevant text in context—"[f]ive years after the use \*\*\* ceases"—is that five years must have elapsed since the last use before the conversion process will occur. *See Webster's Third New Int'l Dictionary* 358 (unabridged ed 2002) (defining "cease" as "to come to an end : break off or taper off to a stop" or "to give over or bring to an end an activity or action : DISCONTINUE"). In that respect, the first sentence of ORS 543A.305(3) operates similarly to forfeiture for nonuse over a period of five years under ORS 540.610, which also refers to "ceasing" use. *See* ORS 540.610(1) (establishing a rebuttable presumption of forfeiture "[w]henever the owner of a perfected and developed water right ceases or fails to use all or part of the water appropriated for a period of five successive years").

The original version of HB 2162 included language that more closely tracked that forfeiture provision. *See* HB 2162 (1999), § 24(5) ("After five successive years of failing or ceasing to use all or part of the water under the water right, the Water Resources Department shall transfer the water to an in-stream water right. The transfer shall occur in lieu of the forfeiture provisions under ORS 540.610."). The bill underwent significant changes before including the paragraph that became ORS 543A.305, but there is no indication that the legislature intended a substantive departure from the way that forfeiture typically operates in the context of water laws. And, considering that water rights are vested rights, *see, e.g.,* ORS 537.120, there is additional reason to doubt that the legislature intended a construction of the statute that would set in motion the conversion process at the moment the use stopped, regardless of whether it later resumed within five years. Accordingly, we reject WaterWatch's alternative contention that the use "ceased" notwithstanding later use within five years.

For the foregoing reasons, we conclude that the circuit court did not err in the ways that WaterWatch contends on appeal, and we affirm the circuit court's judgment.

Affirmed.