Argued and submitted April 29; decision of Court of Appeals reversed, judgment of circuit court reversed, and case remanded to circuit court for further proceedings December 23, 2021

WATERWATCH OF OREGON,
*Petitioner on Review,*

*v.*

WATER RESOURCES DEPARTMENT,
*Respondent on Review,*

*and*

WARM SPRINGS HYDRO LLC,
*Respondent on Review.*

(CC 16CV11938) (CA A165160) (SC S067938)

501 P3d 507

Warm Springs Hydro LLC holds a hydroelectric water right associated with a former dam that has not diverted water since 1995. WaterWatch sought to compel the Water Resources Department to find that ORS 543A.305(3) required that hydroelectric water right to be converted to an in-stream water right because the use of that right for hydroelectric purposes had ceased for a period of at least five years. Respondents argued that the hydroelectric water right was not subject to conversion because it had been periodically leased to the state for use as an in-stream water right, which tolled the statutory five-year time period. On cross-motions for summary judgment, the trial court granted respondents' motions, denied WaterWatch's motion, and dismissed WaterWatch's petition for judicial review. The Court of Appeals affirmed. *Held*: (1) The use of water as an in-stream water right under ORS 537.348 is not "use of water under a hydroelectric water right" for purposes of ORS 543A.305(3); and (2) the hydroelectric water right in this case, which has not been used for more than five years, other than as an in-stream water right under ORS 537.348, is subject to conversion to an in-stream water right under ORS 543A.305(3).

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

En Banc

On review from the Court of Appeals.*

Thomas M. Christ, Sussman Shank LLP, Portland, argued the cause and filed the briefs for petitioner on review.

_____

* Appeal from Marion County Circuit Court, Audrey J. Broyles, Judge. 304 Or App 617, 468 P3d 478 (2020).

Also on the briefs was Brian J. Posewitz, WaterWatch of Oregon, Portland.

Carson L. Whitehead, Assistant Attorney General, Salem, argued the cause and filed the brief on behalf of respondent on review Water Resources Department. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Crystal S. Chase, Stoel Rives LLP, Portland, argued the cause and filed the brief for respondent on review Warm Springs Hydro LLC. Also on the brief were David E. Filippi, Portland, and Merissa A. Moeller, Portland.

Emily Reber, Troutman Pepper Hamilton Sanders LLP, Portland, filed the brief for *amicus curiae* Northwest Hydroelectric Association. Also on the brief was Angela J. Levin, San Francisco, California.

BALMER, J.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

## BALMER, J.

At issue in this case is whether the hydroelectric water right for a hydroelectric power plant that has not operated for 26 years is subject to conversion to an in-stream water right, upon a finding that such conversion would not injure other existing water rights. Conversion of a hydroelectric water right to an in-stream water right by the Oregon Water Resources Department (WRD) is required, upon such a finding, "[f]ive years after the use of water under a hydroelectric water right ceases." ORS 543A.305(3). In this case, the holder of a hydroelectric water right stopped operating the associated hydroelectric power plant in eastern Oregon (the "project") in 1995 and the project was decommissioned; afterward, the holder leased the water right to the state for use as an in-stream water right. That lease has been periodically renewed over the last 21 years and WRD has never commenced the process for converting the hydroelectric water right to an in-stream water right.

Whether the water right here should have been subject to conversion depends on the meaning and interaction of two statutes: ORS 543A.305 (the "conversion statute"), which, as described above, mandates the conversion of a hydroelectric water right to an in-stream water right in certain circumstances, and ORS 537.348 (the "lease statute"), which, among other things, allows a water right holder to temporarily lease its water right to another for use as an in-stream water right. WaterWatch argues that, under the conversion statute, the hydroelectric right is subject to conversion because no water has been used under that right for hydroelectric purposes since 1995, and, therefore, use has ceased. WRD and the current holder of that hydroelectric water right, Warm Springs Hydro LLC (Warm Springs Hydro),[1] respond that the right is not subject to conversion because, even though the water has not been used for hydroelectric purposes, the water has been used for in-stream purposes during the periodic leases of the water right to the state under the lease statute. Therefore, respondents contend, use did not entirely cease in any given five-year period.

---

[1] We refer to the parties by their names, except when we refer to WRD and Warm Springs Hydro together as "respondents."

For the reasons discussed below, we agree with WaterWatch and hold that the hydroelectric water right now held by Warm Springs Hydro is subject to conversion to an in-stream water right under the terms of ORS 543A.305. We therefore reverse the Court of Appeals' decision and the judgment of the circuit court and remand to the circuit court for further proceedings.

## I.   LEGAL BACKGROUND

The statutes at issue in this case are part of a complex and extensive set of laws governing Oregon water, which, among other things, are variously designed to promote "the maintenance and conservation of the water resources of this state," ORS 196.605(1); to "encourage, promote and secure the maximum beneficial use and control" of those resources, ORS 536.220(1)(b); to "provide domestic or municipal and industrial water supply," ORS 552.108(1); and to create a "predictable, efficient regulatory framework for environmentally acceptable development," ORS 196.605(4). *See also* ORS 536.310 (describing several factors considered in formulating a state water resources program).

Those water law statutes, including the key statutes in this case, ORS 543A.305 and ORS 537.348, were enacted on a backdrop of common-law principles that continue to guide Oregon water management, and we review some of that background before addressing those key statutes.

Historically, two common-law doctrines have governed the use of surface water in Oregon and the rest of the United States: riparianism and prior appropriation. *See* Barton H. Thompson, Jr., John D. Leshy & Robert H. Abrams, *Legal Control of Water Resources* 14-15 (5th ed 2013). The riparian doctrine, flowing from the English common law, assigns water rights based on the ownership of land appurtenant to a water source. The riparian doctrine generally applies in states on or east of the Mississippi River, although Oregon and other West Coast states adopted some components of riparianism. *See id.* at 28-33.

The prior appropriation doctrine, which originated from rules applied by Gold Rush miners, applies in the drier, western states. Under prior appropriation, available water

is allocated on a first-in-time, first-in-right basis to anyone who puts the water to a "beneficial use," whether they own land next to the water source or not. Water rights under prior appropriation are assigned a priority date (usually the date that water was first diverted), and in times of shortage, rights with earlier priority dates are addressed fully before rights with later priority dates. *See id.* at 168-73; *Klamath Irrigation District v. United States*, 348 Or 15, 23-24, 227 P3d 1145 (2010).

At first, Oregon adopted a mixed water rights system applying aspects of both doctrines. *See, e.g.*, *Brown v. Baker*, 39 Or 66, 70, 65 P 799, *reh'g den*, 39 Or 75, 66 P 193 (1901) (recognizing both riparian and some appropriated water rights). In 1909, however, the Water Rights Act, Or Laws 1909, ch 216, established prior appropriation as "the prevailing water law of Oregon." *Fort Vannoy Irrigation v. Water Resources Comm.*, 345 Or 56, 64, 188 P3d 277 (2008).

As now codified, Oregon's water law statutes provide that "[a]ll water within the state from all sources of water supply belongs to the public," ORS 537.110, and that, subject to existing rights and certain exceptions, "all waters within the state may be appropriated for beneficial use, as provided in the Water Rights Act and not otherwise." ORS 537.120.

"Beneficial use" is not statutorily defined, but includes at least "irrigation, domestic use, municipal water supply, power development, public recreation, protection of commercial and game fishing and wildlife, fire protection, mining, industrial purposes, navigation, [and] scenic attraction." ORS 537.170(8)(a). Statutes provide for a system to certify water rights by which pre-1909 rights can be formally adjudicated, ORS 539.140, and post-1909 rights can be perfected, ORS 537.250. Once a water right certificate issues, the certificated rights continue "so long as the water shall be applied to a beneficial use" under the terms of the certificate. ORS 537.250(3). The Water Rights Act permits the transfer of water rights and the adjustment of time, place, and type of permitted use, according to certain statutory procedures. *See* ORS 540.520; ORS 540.530. If those procedures are followed, the modification of water rights does not impact their priority date. ORS 540.530(2)(a).

If a water right holder does not put the water to a beneficial use for any five successive years, the water right is subject to forfeiture to the state. ORS 537.250(3); ORS 540.610(1). Once forfeited, water rights are then made available for reappropriation by water users. ORS 540.610(5).

That use-it-or-lose-it frame of prior appropriation provides an incentive for water right holders to divert and use as much water as possible to maintain their rights. But as water conservation and sustainable river ecology became increasingly recognized as public priorities from the 1950s onward, states began to protect in-stream flows and encourage water users to allow water to remain undiverted. *See* Janet Neuman, Anne Squier & Gail Achterman, *Sometimes a Great Notion: Oregon's Instream Flow Experiments*, 36 Env't L 1125, 1133-36 (2006); Philip Roni & Tim Beechie, *Introduction to Restoration*, in *Stream and Watershed Restoration* 1, 5-6 (Philip Roni & Tim Beechie eds. 2013). In Oregon, that largely began with the 1955 Water Resources Act, which, among other things, recognized the importance of minimum perennial in-stream flows.[2] Or Laws 1955, ch 707, § 10(3)(g).

Those minimum in-stream flows were converted to in-stream water rights when, in 1987, Oregon passed the In-stream Water Rights Act, the first of the key statutes in this case. ORS 537.346(1) (converting minimum in-stream flows); Or Laws 1987, ch 859 (the In-Stream Water Rights Act); *see generally* Mary Ann King, *Getting Our Feet Wet: An Introduction to Water Trusts*, 28 Harv Env't L Rev 495, 504-05 (2004) (discussing history of in-stream water rights in Oregon and Washington). That act recognized the validity of in-stream water rights, which allow the amount of water specified in the water right to be left flowing rather than be diverted. ORS 537.332(3). Such rights had previously been unavailable under the prior appropriation regime. The act defines "in-stream water right" as:

---

[2] There were limited precursors—a 1915 act withdrew certain streams flowing into the Columbia Gorge from appropriation "to preserve their scenic beauty," including, for example, Multnomah Creek. Or Laws 1915, ch 36. A few other discrete withdrawals for water quality purposes continued through the 1930s. *See* Charles C. Reynolds, Comment, *Protecting Oregon's Free-Flowing Water*, 19 Env't L 841, 844-45 (1989).

"a water right held in trust by the Water Resources Department for the benefit of the people of the State of Oregon to maintain water in-stream for public use. An in-stream water right does not require a diversion or any other means of physical control over the water."

*Id.* Thus, WRD is the trustee for all in-stream rights.

The In-stream Water Rights Act also established a leasing and transfer system (the "lease statute"), by which water right holders may, under certain conditions, lease all or part of a water right for conversion to an in-stream water right, maintaining the original priority date and forestalling forfeiture for nonuse under ORS 540.610. ORS 537.348. That system, as codified, provides, in part:

"(1)  *Any person may purchase or lease all or a portion of an existing water right or accept a gift of all or a portion of an existing water right for conversion to an in-stream water right.* Any water right converted to an in-stream water right under this section shall retain the priority date of the water right purchased, leased or received as a gift. At the request of the person the Water Resources Commission shall issue a new certificate for the in-stream water right showing the original priority date of the purchased, gifted or leased water right. Except as provided in subsections (2) to (6) of this section, a person who transfers a water right by purchase, lease or gift under this subsection shall comply with the requirements for the transfer of a water right under ORS 540.505 to 540.585 [(establishing procedures for changes in use of water and transfer of water rights)].

"(2)  Subject to subsections (3) to (6) of this section [which concern split-use rights and departmental procedures], *any person who has an existing water right may lease all or a portion of the existing water right for use as an in-stream water right* for a specified period without the loss of the original priority date. During the term of the lease, the use of the water right as an in-stream water right shall be considered a beneficial use. The term of the lease may not exceed five years. There is no limitation on the number of times that the lease may be renewed."

(Emphases added.) Thus, those with existing water rights may lease those rights to others in five-year (or shorter) increments, and others may purchase, accept, or lease those

rights, which WRD then holds in trust. The use of water rights leased under that statute, whether they were hydro-electric water rights or another kind of rights before they were leased, qualifies as beneficial use and therefore fore-stalls forfeiture for nonuse under ORS 540.610(1). We inter-pret the In-stream Water Rights Act as applied to this case more extensively below.

Along with regulating water rights and in-stream flows, the Oregon legislature also has addressed hydro-electric projects. As noted above, power generation has long been considered a beneficial use of water in Oregon. In 1931, the legislature created a new regulatory program for hydroelectric projects and established the Hydroelectric Commission (now the Water Resources Commission, Or Laws 1985, ch 673) to govern their licensure and to oversee development of state waters for power generation. Or Laws 1931, ch 67. Under that statute, the duration of hydroelec-tric licenses is limited to 50 years, or, for projects regulated by the Federal Energy Regulatory Commission (FERC), to a term concurrent with the project's federal license. ORS 543.260(1). (Section 6 of the Federal Power Act limits FERC licenses to 50 years as well. 16 USC § 799.)

By the 1990s, over 50 years later, many of the state's hydroelectric licenses issued under the above-mentioned statutes had expired or were nearing expiration, so the 1995 legislature created a "hydroelectric task force to recommend a process and standards for a coordinated state review of existing facilities." ORS 543A.010 (task force created by Or Laws 1995, ch 229, § 6). Based on that task force's legislative recommendations, the 1997 Legislative Assembly enacted a suite of laws concerning reauthorization of hydroelectric projects. ORS ch 543A. That legislation included one section related to the decommissioning of hydroelectric projects. That section, which is not at issue in this case, directs the Water Resources Commission to adopt procedures regard-ing project decommissioning and allows the commission to order decommissioning of a project in certain circumstances. ORS 543A.300.

The legislature also created another task force to "develop recommendations for decommissioning." Or Laws

1997, ch 449, § 39(2). That task force recommended a provision that, as amended, became ORS 543A.305, the second key statute in this case (along with the lease statute).[3] ORS 543A.305, the conversion statute, establishes that, upon a finding by the Water Resources Director that the conversion will not injure other water rights, existing hydroelectric water rights will be converted to in-stream water rights "[f]ive years after the use of water under [the] hydroelectric water right ceases." That statute reads, in part:

> "(3)  *Five years after the use of water under a hydroelectric water right ceases*, or upon expiration of a hydroelectric water right not otherwise extended or reauthorized, or at any time earlier with the written consent of the holder of the hydroelectric water right, up to the full amount of the water right associated with the hydroelectric project shall be converted to an in-stream water right, upon a finding by the Water Resources Director that the conversion will not result in injury to other existing water rights. * * *

> "* * * * *

> "(6)  If hydroelectric production is not the sole beneficial use authorized by a water right, this section shall apply only to conversion of that portion of the water right used exclusively for hydroelectric purposes."

ORS 543A.305 (emphasis added). In-stream water rights created through the conversion mandated by that statute are "maintained in perpetuity, in trust for the people of the State of Oregon." ORS 543A.305(2). According to the report of the second task force, the intent of recommending a conversion statute of some kind was "to provide water for instream purposes while maintaining stability and the current water regime among users." In essence, by substituting an in-stream water right for the hydroelectric water right that has ceased being used (rather than allowing the water to be reappropriated for another use), the decommissioning of a project would not affect users up- or downstream from the project.

---

[3] The legislation as introduced had substantial additional provisions regarding decommissioning, but they were not enacted, and the legislative history of that bill beyond what is discussed here does not help illuminate the issues in this case.

With that understanding of historical and contemporary Oregon water law, we turn to the specific facts of the case before us.

## II.   FACTUAL BACKGROUND

We take the facts, which are essentially undisputed, from the record in the trial court and before WRD.[4] Rock Creek is a small stream in eastern Oregon that flows into the Powder River, which, in turn, flows into the Snake River. Rock Creek runs through the Elkhorn Mountains on the historic lands of at least the Cayuse, Umatilla, Walla Walla, and Nez Perce peoples, and is now partially within the Wallowa-Whitman National Forest. The creek hosts populations of rainbow, redband, and brook trout and is also viable habitat for bull trout, which have been federally designated as a threatened species under the Endangered Species Act since 1998. 50 CFR § 17.11(h); Determination of Threatened Status for the Klamath River and Columbia River Distinct Population Segments of Bull Trout, 63 Fed Reg 31,647 (June 10, 1998). Like many waters in Oregon and throughout the West, Rock Creek has water quality issues involving temperature, dissolved oxygen, sedimentation, and pH levels.

In 1903, developers began building on Rock Creek the hydroelectric power generation project at issue in this case. The Rock Creek project would eventually include a 70-foot-long concrete dam and intake structure, an 8,000-foot-long wooden flume, a 15-foot-long earthen dam, a 2,720-foot-long penstock, and a powerhouse with two 400-kW generators. Completed in 1904 or 1905, the project powered Baker City's first electric lights and new streetcar system. The company that owned the project eventually merged with others to become the Eastern Oregon Light and Power Company.

---

[4] We also take judicial notice of the environmental assessment prepared by FERC for the Rock Creek project. FERC, *Environmental Assessment for Hydropower License: Rock Creek Hydroelectric Project* (2020) (Docket No. 12726-002), *available at* https://cms.ferc.gov/sites/default/files/2020-07/P-12726-002%20 Rock%20Creek%20EA.pdf (accessed Dec 16, 2021); OEC 201(b)(2) (so permitting); *see also Fort Vannoy Irrigation*, 345 Or at 84 n 19 (taking judicial notice of water right certificate and related official documents prepared by government agency).

In 1923, after the Oregon Legislative Assembly established procedures for the perfection of water rights, Or Laws 1909, ch 216, Eastern Oregon Light and Power Company obtained a water right certificate from the state allowing the use of 13 cubic feet of water per second from Rock Creek for the purpose of "Power." That certificate has a priority date of 1902. (A water right that does not expire, such as this one, is sometimes called a "power claim," *see, e.g.*, ORS 543.075(4) (defining "power claimant"), but that terminology does not affect this case, and we refer to the right here as a "water right" throughout.)

Eastern Oregon Light and Power Company became part of the California-Pacific Utility Company, to which FERC issued a 50-year license for the project in 1946. In 1988, the California-Pacific Utility Company transferred the license to what is now the Oregon Trail Electric Cooperative (OTEC). In 1995, OTEC shut the project down and stopped diverting water. The project's FERC license expired the following year. After expiration, a FERC license must be formally "surrendered" to remove the project from federal jurisdiction and oversight. *See* 16 USC § 799; 18 CFR pt 6 (2021). FERC approved the surrender of the Rock Creek project's license in 2003.

In 2000, after ORS 543A.305 was enacted, but less than five years after OTEC stopped diverting water from Rock Creek, OTEC briefly leased its hydroelectric water right to the state for use as an in-stream water right for 10 months. OTEC eventually transferred the remaining components of the project and the associated water right to another company, which renewed the in-stream water right lease to the state from 2005 to 2009, and again from 2010 to 2011. After that, Warm Springs Hydro became involved and acquired the water right associated with the project and again renewed the water right lease to the state from 2015 to 2020.

At some point, WaterWatch grew concerned that Warm Springs Hydro intended to restart the project after the next lease term ended, 25 years after the project had last diverted water. WaterWatch therefore petitioned WRD to reconsider its approval of the 2015 in-stream lease renewal.

WaterWatch contended that the periodic lease renewals were an attempt to circumvent the conversion statute, and that WRD was required under that statute to convert Warm Springs Hydro's water right to an in-stream water right held by the state. WRD did not act on the petition, and it was deemed denied.

WaterWatch petitioned for judicial review of WRD's approval of the lease renewal[5] and to compel WRD to initiate the conversion process. *See* ORS 536.075(1) (providing for judicial review of orders other than contested cases issued by WRD); ORS 183.484(1) (conferring jurisdiction for review of orders other than contested cases on the circuit court); ORS 183.490 (authorizing the circuit court to "compel an agency to act where it has unlawfully refused to act or make a decision or unreasonably delayed taking action or making a decision"). Warm Springs Hydro intervened in the action, opposing WaterWatch, and the parties filed cross-motions for summary judgment regarding, for the most part, the interpretation and application of the conversion process for a hydroelectric water right that is set out in ORS 543A.305(3).

The trial court concluded that any beneficial use of water under Warm Springs Hydro's water right (including in-stream water uses under a lease) restarted the five-year clock in the conversion statute, and that beneficial use had occurred at least once every five years since diversion stopped. The court therefore granted summary judgment in favor of respondents, denied WaterWatch's motion, and dismissed the action.

WaterWatch appealed the trial court judgment to the Court of Appeals, which affirmed. *WaterWatch of Oregon v. Water Resources Dept.*, 304 Or App 617, 468 P3d 478 (2020). The Court of Appeals interpreted the phrase "use of water under a hydroelectric water right" in ORS 543A.305(3) to include "any beneficial use" of water associated with a hydroelectric project. *Id.* at 630. The court reasoned that, because the water associated with the Rock Creek project had been periodically leased to the state and used for

---

[5] While this case was pending, the term of the most recent lease expired, possibly rendering WaterWatch's petition on that issue moot. The action to compel WRD to initiate the conversion process, however, remains a live issue on appeal.

in-stream purposes at least once every five years, no five-year period had passed since the use of that water "ceased," and the right was not subject to conversion. *Id.* at 633-34.

We allowed WaterWatch's petition for review.

### III.   ANALYSIS

The question before us on review is whether the hydroelectric water right now held by Warm Springs Hydro, which has been leased to the state periodically for over 20 years, became subject to conversion to an in-stream water right under the conversion statute at some point during that period. The answer depends on whether the "use of water under [the] hydroelectric water right cease[d]," and if so, when. ORS 543A.305(3). WaterWatch points out that no water has been diverted or otherwise used for hydroelectric purposes under the right since 1995 and contends that the hydroelectric right is therefore subject to conversion—and that it should have been considered as such as early as 2000. Respondents counter that, because WRD was using the right as an "in-stream water right" during the terms of the periodic leases of the right to the state under the lease statute, use has not ceased and the right therefore never became subject to conversion. Thus, the outcome of this case depends on the meaning of and interaction between the conversion statute and the lease statute. We examine those statutes in that order, looking to the statutes' text, context, and, as appropriate, legislative history. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009).

A.   *The Conversion Statute, ORS 543A.305*

The conversion statute provides, in part:

"Five years after the use of water under a hydroelectric water right ceases, \*\*\* up to the full amount of the water right associated with the hydroelectric project shall be converted to an in-stream water right, upon a finding by the Water Resources Director that the conversion will not result in injury to other existing water rights."

ORS 543A.305(3). The parties dispute what "the use of water under a hydroelectric water right ceases" means and, therefore, when the conversion statute is triggered. There

are two key components to that phrase: what it means to use water "under a hydroelectric water right" and what it means for that use to "cease[]."

Regarding the first phrase, WaterWatch argues that "the use of water under a hydroelectric water right" means only *hydroelectric* use, while respondents contend that that phrase includes any lawful, beneficial use. Turning first to the text of the statute, we note that, by statute, the term "water right" "includes the use of water for hydroelectric purposes" pursuant to a state license. ORS 543A.005(8). That definition, however, does not resolve the meaning of "hydroelectric water right." We therefore turn to the statute's context, including related water law statutes. Drawing on the legal background discussed above, we highlight the statutes that are particularly relevant here to demonstrate that, as WaterWatch argues, for purposes of the conversion statute, water use "under a hydroelectric water right" can only be hydroelectric use.

All water in Oregon belongs to the public. ORS 537.110. Water can be appropriated, however, for beneficial use. ORS 537.120. With few exceptions, an appropriation can be made only with a state-issued permit. ORS 537.130(2). To get a permit, applicants must specify how they intend to use the water. ORS 537.140(1)(a)(C). Whether or not an application is approved depends, in part, on the nature of the proposed use. ORS 537.160(1). Once a permit is issued, water right holders may only appropriate water at the rate, time, and place specified in the permit, and cannot use the water for an unpermitted purpose. Changing the permitted use requires a formal transfer process managed by WRD. ORS 540.520; ORS 540.530.

We note that water rights were limited to specified uses at common law, before the modern statutory water law regime. *See Simmons v. Winters*, 21 Or 35, 44, 51, 27 P 7 (1891) ("[I]n order to make a valid appropriation of water, it is required to be made for some beneficial purpose then existing or contemplated, and that the amount of water appropriated must be restricted to the quantity needed for such purpose. *** That much [the right holders are] entitled to use, when needed or necessary for the purposes specified.").

In 1908, this court held that a farmer's irrigation water right did not grant him "title to the water, but only the right to use it for the purposes for which it was appropriated." *Williams v. Altnow*, 51 Or 275, 301, 303, 97 P 539 (1908) (on rehearing). We further held that the farmer could not "subsequently change or enlarge his use to [other appropriators'] injury." *Id.* The modern statutory regime serves to formalize that common-law principle, but instead of merely assigning liability for injury resulting from improper changes in use, the statutes require water right holders to get approval from WRD (including a determination of potential injury) before changing the amount, place, time, or type of their use. ORS 540.520; ORS 540.530.

To refer to a water right for a particular kind of use, the legislature sometimes uses adjectival phrases. For example, as used in the conversion statute, "in-stream water right" means a right "to maintain water in-stream for public use." ORS 537.332(3). An in-stream water right can, in general, be used for no other purposes than in-stream ones, such as recreation, habitat conservation, and navigation. *See* ORS 537.332(5) (identifying types of "public use" for purposes of statutory definition of "in-stream water right"). Thus, an "in-stream water right" does not permit both in-stream uses and other beneficial uses that are *not* in-stream uses, such as irrigation or bottling, and the adjective "in-stream" serves to describe the type of use permitted by the water right.

Similarly, we understand the phrase "hydroelectric water right" as used in the conversion statute to refer to a water right that permits the use of water for hydroelectric purposes. WRD raises the possibility that a hydroelectric water right might permit hydroelectric *and other* uses, but, as explained below, we conclude that that is not the case.

It is possible, of course, for a water right to permit multiple beneficial uses, as specifically contemplated in part of the conversion statute: "If hydroelectric production is not the sole beneficial use authorized by a water right, this section shall apply only to conversion of that portion of the water right used exclusively for hydroelectric purposes." ORS 543A.305(6). Thus, "the water right associated with [a]

hydroelectric project," described in ORS 543A.305(3), might not be solely a hydroelectric water right, and, in that case, only the portion of the right that *is* used for solely hydroelectric purposes would be subject to conversion. But water rights that permit multiple uses are generally called "water rights," not a particular kind of water right (*e.g.*, "hydroelectric" or "in-stream"). ORS 543A.305(6) itself refers to a right that authorizes multiple uses as simply "a water right." If a hydroelectric water right was one that authorized hydroelectric use along with other uses, then we would expect the legislature to have written the opening clause of that statute to provide: "If hydroelectric production is not the sole beneficial use authorized by a *hydroelectric* water right, * * *." The legislature did not write the statute that way, and the text does not support respondents' position.

To summarize, we understand the adjective "hydroelectric" to describe the use permitted by a hydroelectric water right. Although some water rights might authorize the use of water for hydroelectric and other purposes, a "hydroelectric water right," by itself, permits the use of water only for hydroelectric purposes. Here, the water right that is now held by Warm Springs Hydro authorizes the use of water for "Power." We therefore understand that right to be a right that permits the use of water solely for hydroelectric purposes, that is, a hydroelectric water right, and not a right that permits other beneficial uses.

We next consider what it means to use water "under" a hydroelectric water right. ORS 543A.305(3). "Under," as used here, means "required by : in accordance with : bound by * * * <rights ~ the law>." *Webster's Third New Int'l Dictionary* 2487 (unabridged ed 2002). Use under a hydroelectric water right is, therefore, use "in accordance with" that right. Because hydroelectric water rights permit use only for hydroelectric purposes, we conclude that "the use of water under a hydroelectric water right" in ORS 543A.305(3) refers to the use of water for hydroelectric purposes, as permitted by such a right.

In opposition to that reading, respondents contend that, even if a hydroelectric water right is one that authorizes

hydroelectric use, the conversion statute itself does not specify any particular kind of use "under" that right, and thus, *any* beneficial use of the water associated with the water right is use "under" that right. Respondents emphasize that the statute does not say "*hydroelectric* use of water under a hydroelectric water right" or "use of water *for hydroelectric purposes*," and that the legislature has used similar phrases elsewhere. If the legislature had meant to refer only to hydroelectric use, they argue, it would have so specified in the conversion statute.

That argument is not persuasive. As we have already shown, the statute is clear despite the absence noted by respondents of the extra modifier "hydroelectric." Warm Springs Hydro is correct that, as a general rule, "[t]he legislature knows how to include qualifying language in a statute when it wants to do so." *PGE v. Bureau of Labor and Industries*, 317 Or 606, 614, 859 P2d 1143 (1993). But we do not expect the legislature to do so where, as here, that qualifying language would be redundant or unnecessary to understand the statute.

Respondents also argue, turning to context, that the conversion statute should be read in light of Oregon's water rights regime more broadly and, in particular, ORS 540.610, which provides that water rights that go unused for five successive years are subject to forfeiture. Any kind of beneficial use tolls ORS 540.610, restarting that statute's five-year clock. Respondents assert that the legislature intended the conversion statute at issue here to operate the same way, with any beneficial use tolling the conversion statute.

That argument disregards the fact that ORS 540.610 and the conversion statute are worded differently in a way that is meaningful here. ORS 540.610 is triggered when the holder of a water right "ceases or fails to use all or part of the water appropriated for a period of five successive years." ORS 540.610(1). That statute variably uses the phrases "ceases or fails to use," "the failure to use," *id.*, and "failure to use beneficially," ORS 540.610(2). The conversion statute, in contrast, is triggered "[f]ive years after

*the use of water under a hydroelectric water right* ceases." ORS 543A.305(3) (emphasis added). The conversion statute's language is plainly narrower than ORS 540.610, supporting the interpretation that, although ORS 540.610 refers to beneficial uses generally, the conversion statute refers to the *hydroelectric* use of water, not *any* beneficial use.

Our interpretation is further bolstered by the statutes' respective legislative histories. ORS 540.610 codified a longstanding principle of prior appropriation broadly applicable to water rights in Oregon that was generally intended to encourage water use, rather than having water rights go unexercised. Or Laws 1913, ch 279, § 1; *Wimer v. Simmons*, 27 Or 1, 6, 39 P 6 (1895) ("[A]bandonment may be express and immediate, * * * or it may be implied from [the appropriator's] neglect, failure of application to the purpose designed within a reasonable time, nonuse[], and the like."); *see also* ORS 536.220(1)(b) (declaring that it is the policy of the state to "encourage, promote and secure the maximum beneficial use and control" of water resources in the state). Putting water to any beneficial use would serve that broad purpose. The conversion statute, by contrast, was considered as part of a bill addressing the narrower problem of hydroelectric project decommissioning (most provisions of which were not enacted). House Bill (HB) 2162 (1999). The task force that drafted an initial version of the conversion statute at the legislature's request wrote that the purpose of the conversion requirement was "to provide water for instream purposes while maintaining stability and the current water regime among users." To the extent that the legislature may have taken up that purpose, we note that interpreting the conversion statute to be tolled by any beneficial use would not serve that end. Substituting one use for another— particularly one, like hydroelectric use, that requires diversion for one that does not—could affect or harm other appropriators, and thereby not "maintain[] stability" in the current water regime.

For those reasons, we reject respondents' invitation to read the conversion statute as parallel to the forfeiture statute, ORS 540.610, and we interpret "the use of water

under a hydroelectric water right" to refer only to use *for hydroelectric purposes*.[6]

Having established what it means to use water under a hydroelectric water right, we next consider what it means for that use to "cease[]." WaterWatch and WRD provide only limited argument as to the proper interpretation of the word "cease[]." WaterWatch asserts that "'ceases,' in the context of 'decommissioning,' means a discontinuation of use intended to be permanent." WaterWatch also posits that, whatever "cease" means, use of the water here must have ceased no later than 2003 because, by that point, "it was not possible, legally or physically, to use the water for [hydroelectric] purpose[s]." WRD, for its part, largely ignores the word "ceases," although it does substitute at one point the phrase, "the use of water stopping." Warm Springs Hydro, on the other hand, interprets "cease[]" more thoroughly, and although we disagree with their ultimate statutory conclusion here, our interpretation of "cease[]" largely follows theirs, as laid out below.

"Cease[]," as used intransitively here, means "to come to an end : break off or taper off to a stop" or, alternatively, "to give over or bring to an end an activity or action : DISCONTINUE." *Webster's* at 358. Both of those dictionary definitions connote permanence by referring to the "end" of activities, rather than a pause. *Id.* Of course, what the concept of permanence entails in the context of ceasing to use water could be unclear, but the legislature specified in this statute that there is a five-year timeline by which to measure whether use has "cease[d]." Applying the above definitions to

---

[6] Warm Springs Hydro cautions that, in adopting the above position whereby the conversion statute refers only to hydroelectric use while the forfeiture statute refers to any use, this court would be creating a "new rule of law specific to hydroelectric rights," one that, in effect, may put a five-year clock on maintenance or upgrades for hydroelectric projects in Oregon. That argument is misplaced. The legislature enacted ORS 543A.305, and it expressly applies only to hydroelectric water rights and does so more narrowly than the broader forfeiture scheme.

We also note that hydroelectric projects may still avoid conversion of their water rights by changing the authorized use of their rights through the process set out in ORS 540.520 and ORS 540.530. ORS 543A.305(7). Through that process, hydroelectric projects faced with the prospect of a lengthy closure may be able to maintain their ability to restart power generation in collaboration with WRD.

the conversion statute, we understand the statute to be triggered once five years have passed during which water was not used under a hydroelectric water right. Pausing temporarily is not the same as "ceas[ing]," so a temporary pause is insufficient to trigger the statute.

Put another way, if the use of water under the hydroelectric water right resumes within five years of a stoppage, then that stoppage was temporary, and use did not "come to an end" and therefore did not cease. *Id.* If use under the hydroelectric right does not resume within five years of a stoppage, then that stoppage is considered permanent, and use has ceased—triggering the conversion statute. In that respect, as the Court of Appeals noted, the first sentence of ORS 543A.305(3) operates similarly to ORS 540.610, which also refers to "ceas[ing]" use. *WaterWatch of Oregon*, 304 Or App at 633. We observe that that reading comports with the unavoidable need for hydroelectric projects to occasionally pause diversion for emergencies, maintenance, or other reasons.

WaterWatch's assertion that "cease[]" means "a discontinuation of use intended to be permanent" is unfounded. WaterWatch is correct that this statute was considered as part of a larger bill on decommissioning, most of which, as noted, was ultimately not enacted, but that context does not lead to the result WaterWatch supposes, and even if it did, the text could not bear such a result. By its text, ORS 543A.305(3) is triggered five years after "the use" of water ceases, not five years after a project's owners *decide* to decommission it or stop using water with the intent of not resuming. The text indicates that when the statute is triggered is an objective question, not an intent-based one. WaterWatch's reading, along with reaching far beyond the text of the statute to incorporate the concept of intent, would, as Warm Springs Hydro points out, require WRD and the courts to attempt to discern whether a pause in the use of water under a hydroelectric right was "intended" to be temporary or permanent. Besides requiring the court to supply the details for a standard which is not expressed in the text, that standard would leave water users and WRD with no clear indication of when conversion proceedings might be or must be initiated.

Respondents concede that the water associated with the hydroelectric water right that is now held by Warm Spring Hydro has not been used for hydroelectric purposes since 1995. That use ceased.

Therefore, looking only at the conversion statute, the hydroelectric water right for the Rock Creek project should have been subject to conversion to an in-stream water right five years later, in 2000. Respondents argue, however, that the lease statute—which allows water associated with a diversionary water right, like the hydroelectric water right here, to be used for in-stream purposes—has the effect of tolling the five-year period in the conversion statute. We turn to that argument.

B.   *The Lease Statute, ORS 537.348*

Respondents contend that, under their interpretation of the conversion statute, the water right is not subject to conversion because the water was put to a lawful, beneficial use at least once every five years since hydroelectric use stopped. The use they refer to is the state's use of the water as an in-stream flow under the terms of the periodic leases of the water right to the state under the lease statute. The lease statute permits, among other things, the lease of an existing water right "for conversion to an in-stream water right." ORS 537.348(1). In respondents' view, that in-stream use means that "the use of water under [the] hydroelectric water right" has not ceased and that the conversion statute therefore has not been triggered. ORS 543A.305(3).

WaterWatch observes that, under the lease statute, a leased water right is temporarily "converted to an in-stream water right." ORS 537.348(1). WaterWatch reasons that, after conversion, the right is no longer a hydroelectric water right. Thus, WaterWatch concludes, the use of water under a right converted to an in-stream water right by operation of ORS 537.348(1) is use under *that* in-stream right and is no longer use under the previous hydroelectric right.

Respondents, in contrast, posit that ORS 537.348(1) and ORS 537.348(2) describe two different kinds of leases. Under their reading, rights leased under subsection (1) of the

lease statute are "converted" to in-stream water rights (and are, WRD admits, no longer hydroelectric water rights), but rights leased under subsection (2) of that statute are merely "use[d] as" in-stream water rights. In respondents' view, the lease of a water right might be subject to subsection (1) *or* (2), but not both. Respondents contend that the lease here was subject to subsection (2), not subsection (1), and that, therefore, the hydroelectric water right is *not* subject to conversion to an in-stream water right under subsection (1).

WRD misreads the statute. By its plain text, ORS 537.348(1) describes how "[a]ny person" may acquire by purchase, lease (as *lessee*), or gift, all or part of an existing water right "for conversion to an in-stream water right." The transfer of a water right by such a purchase, lease, or gift, must comply with the procedural requirements under ORS 540.505 to 540.585, the subsection states, except as provided in ORS 537.348(2) to (6). ORS 537.348(2) then describes how a person with an existing water right may lease that right (as *lessor*) to another person "for use as an in-stream water right for a specified period." Subsection (2) further specifies that the term of such lease may not exceed five years and that such leases may be renewed any number of times. The remainder of ORS 537.348 contains provisions concerning split-use water rights and procedural requirements that are not relevant here.

Subsections (1) and (2) are complementary and describe, among other things, a unified leasing system: Subsection (1) applies to those acquiring or leasing (as lessee) a water right that is to be converted to an in-stream water right; subsection (2) applies to those who are leasing (as lessor) an existing water right for the conversion described in subsection (1). Both subsections describe the same leases.

If those two subsections were intended to set up different types of leases, as WRD contends, there would be no reason for the legislature to specify that transferors under subsection (1) must comply with the other transfer statutes (ORS 540.505 to 540.585) "[e]xcept as provided in subsections (2) to (6) of this section." ORS 537.348(1). The simplest and most straightforward reading of the statute as a whole is not that the subsections somehow create different

leasing programs, but that subsection (1) describes the ways in which persons may acquire water rights for conversion to in-stream water rights, and subsections (2) through (6) describe the ways in which these particular kinds of transfers diverge from those governed only by the broader transfer statutes. WRD's reading, by contrast, would render portions of the statute meaningless.[7]

We note that our understanding is consistent with WRD's own regulations, which define "[i]nstream lease" to mean "the *conversion* of all or a portion of an existing water use subject to transfer to an instream water right for a specified time-period *as authorized by ORS 537.348(2)*." OAR 690-077-0010(14) (emphases added). Although that definition does not supersede the statutory text, it supports our interpretation, and we observe that respondents' position here—that subsection (2) does not involve the "conversion" of existing water rights to in-stream water rights—appears to conflict with that regulatory definition, which expressly defines a lease under subsection (2) to constitute a "conversion." *Id.*

With that understanding of ORS 537.348, it is apparent that any water right leased under that statute is "converted to an in-stream water right," either temporarily, for the term of a lease, or permanently, following a transfer through purchase or gift. The person holding the water right may then "obtain a new certificate for the in-stream water right." *Id.* Once a hydroelectric right has been converted to an in-stream water right, it is no longer a hydroelectric water right for the duration of the conversion. Any use of the water under the resulting in-stream water right is use under *that* right, not use under the previous hydroelectric water right.

---

[7] The version of ORS 537.348 enacted in 1987, Or Laws 1987, ch 859, § 9(1), did not have the "except" text quoted above, which was added in 2013, Or Laws 2013, ch 165, § 1. To the extent that previous versions of ORS 537.348 may have applied to the original lease and early renewals of the water right at issue here, we understand those versions to similarly set up a single leasing system and not to create separate leasing systems in subsections (1) and (2). In the original 1987 version of ORS 537.348, for example, which did not have any of the subsequently added text on split use or other topics, subsection (1) still authorized the acquisition of water rights for conversion, while subsection (2) authorized holders of existing water rights to lease those rights for acquisition through subsection (1). Or Laws 1987, ch 859, § 9.

That conclusion aligns with our previously stated under-standing of a hydroelectric water right as one that permits the use of water for hydroelectric purposes; after conversion, use of water for hydroelectric purposes is no longer permit-ted, so there is no hydroelectric water right.

C.  *Application*

We now apply the above understanding of the con-version and leasing statutes to the water right at issue here. As explained above, without some other statutory authori-zation, the use of water under a hydroelectric water right is use of that water for hydroelectric purposes. Five years after the use of water under a hydroelectric water right ceases, that right is subject to conversion to an in-stream water right held in trust by WRD in perpetuity. ORS 543A.305(2). The Rock Creek project, which relies on a solely hydroelec-tric water right, has not used water for hydroelectric pur-poses since 1995. The water right associated with that proj-ect therefore was subject to conversion in 2000.

The periodic leases of the hydroelectric water right to the state under the lease statute do not change the appli-cation of the conversion statute. When OTEC leased the hydroelectric water right to the state in 2000, and during each subsequent lease renewal by subsequent right holders, the right was temporarily converted to an in-stream water right. The parties agree that any beneficial use forestalls forfeiture, so that temporary use tolled ORS 540.610. But only use under the hydroelectric right tolls the conversion statute. After 1995, there was no use under the hydroelectric right, and the conversion statute was therefore triggered.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.